STATE OF IOWA, Appellee, v. L. N. HALL, Appellant.

CRIMINAL LAW: Misconduct in Argument—Matters Outside Record
1 —Decision of Trial Court. Decisions of the trial court that certain irregularities occurring during argument were not sufficiently prejudicial to require a new trial are quite influential with the appellate court, especially where the trial court promptly condemned the remarks, orally cautioned the jury and specifically instructed the jury to disregard the same.

CRIMINAL LAW: Burglary—Intent to Commit Adultery—Evidence,
2 Sufficiency of. Evidence reviewed and held sufficient to sustain conviction of entering a dwelling-house in the night-time with intent to commit adultery.

**WITNESS:** Evidence—Partial or Indefinite Identification of Person 3 —Admissibility. The fact that a witness is not able to positively identify a certain person on a certain occasion goes not to the admissibility of the testimony but to its weight.

**CRIMINAL LAW:** Burglary—Abandonment of Criminal Purpose. 4 An instruction on the effect of an "abandonment" of any criminal intent on the part of defendant, accused of entering a dwelling-house in the night-time with intent to commit adultery, was properly omitted when there was no evidence of any abandonment of such criminal intent until after defendant entered the house and was struck over the head with an axe by an infuriated and much wrought-up husband.

**CRIMINAL LAW:** Instructions—Setting Forth Charge—Use of 5 Legal Phraseology. It is not error for the court, in setting forth the formal charge in the indictment, to close the instruction with the formal expression, "all contrary to law."

**CRIMINAL LAW:** Instructions—Quoting Statute—Superfluity. It 6 is not error for the court in explaining the elements constituting the offense charged to quote more of the statute than applies to the charge in question—the excess being simply superfluous.

**CRIMINAL LAW:** Instruction—All Elements Not Included. Each 7 and every instruction need not be complete as to all elements of the offense. It is sufficient if they are complete as a whole.

**INDICTMENT AND INFORMATION:** Burglary—Intent to Commit 8 mit Adultery—Name of Other Party. An indictment for entering a dwelling-house in the night-time with intent to commit adultery need not allege the name of the person with whom defendant intended to commit such offense.

**BURGLARY:** Sentence—Hard Labor. A sentence of imprisonment 9 at hard labor may be imposed under Sec. 5652, Code Sup. 1913, following a conviction for so-called burglary under Sec. 4791, Code.

**BURGLARY:** Entering — Intent — "Public Offense" — Adultery. 10 Adultery is a "public offense" within the meaning of Sec. 4791, Code, and entering a dwelling-house in the night-time with intent to commit such offense is punishable thereunder.

*Appeal from Benton District Court.*—Hon. B. F. Cummings, Judge.

SATURDAY, DECEMBER 19, 1914.

THE defendant was convicted and sentenced to pay a fine of $100.00 and to be imprisoned in the county jail for one year for the crime of entering a dwelling-house in the night-time with intent to commit a public defense, to wit, adultery. From such judgment, he appeals.—*Affirmed.*

*C. W. E. Snyder* and *F. E. Northrup,* for appellant.

*George Cosson,* Attorney General, *Wiley S. Rankin,* Special Counsel, and *M. J. Tobin,* for appellee.

PRESTON, J.—The evidence shows, without conflict, that on the night of June 17, 1913, or rather at about one o'clock in the morning, the defendant entered the basement of the dwelling-house occupied by L. G. Ruhl, with his wife and children.

I. The first point argued and relied upon for reversal is the alleged misconduct of M. J. Tobin, one of the attorneys for the state, in his closing address to the jury.

1. CRIMINAL LAW: misconduct in argument: matters outside records: decision of trial court.

The part of the closing argument objected to is the statement that Mr. Ruhl, the prosecuting witness, was poisoned. The substance of the record, and the part of the argument objected to, is as follows:

"Snyder went outside of this record, without intending to do any wrong, in my judgment, to say that Lee Ruhl brought upon himself his own sickness, because of paralysis or breaking down of the nerves; and Northrup went outside of this record to say that perhaps it was the act of Almighty God for wrongs that he had never committed. I want to tell them so they will never get it into their minds again, that it was neither. Lee Ruhl was poisoned. That is what is the matter with Lee Ruhl.

"Mr. Northrup: The defendant at this time objects and excepts to the remarks of counsel wherein he states that Lee

Ruhl was poisoned, as not supported by any testimony whatever.

"The Court: The court wants to remark here to the jury that there is absolutely no place in this case for that remark or for the consideration of anything of the kind. I do not believe I would follow that idea further."

Whereupon, Mr. Tobin stated that the remark was made because of the records that both lawyers had made that were in the case and that he was not going to let the witness Ruhl be misunderstood by any such unwarranted remarks as counsel made, and that such was his explanation and reason for his statement.

Counsel for defendant again objected and excepted to the remarks of Mr. Tobin made after the remarks of the court. Thereupon the court said:

"The question of whether or not Mr. Ruhl was poisoned, or what caused his present condition, has nothing to do with this case, and the jury will bear that suggestion in mind.

"Mr. Tobin: And, Gentlemen of the Jury, when I made the statement, I knew, and now say to you, that the defendant Hall had nothing to do with the poisoning.

"Mr. Northrup: Same objection and exception is made to the remarks of counsel and to the inference that there was poisoning.

"Court: Yes. That has no place in this case whatever.

"Mr. Northrup: And, because of the influence resulting from the remarks, the defendant at this time asks the discharge of the jury, and the case continued."

Which was overruled.

It is conceded that the remarks as to the poisoning were outside the record, and the claim is made that it was in answer to argument for the defendant. The court admonished the jury not to consider the statement, and the court gave a

written instruction directing the jury to disregard the statement. We think this cured the error, if any there was, and the jury being so advised, there was no prejudice to appellant. Perhaps we ought to say that the evidence shows that at the time of the transaction of the alleged burglary Mr. Ruhl was in good health, but his wife testified on the trial that he had returned from the hospital about two months before the trial and it is admitted in argument here that at that time he was in very poor health.

Counsel for appellant admit in argument that they did go out of the record in their opening argument to the jury and did give their version of what the trouble was with Mr. Ruhl, but they do not agree exactly with counsel for the state as to what they did say. They also admit that they have gone outside the record in this court, in that they have referred to a divorce case between the Ruhls since the trial of the instant case, in which they wish this court to infer that the trial court refused to grant a divorce to Mr. Ruhl because of the adultery of his wife, and counsel for the state respond to that by saying that a divorce was granted on the ground of desertion.

We very much prefer that counsel for either side try their cases according to the rules, and we do not, of course, consider any statements outside the record. It is another case where the closing argument is reported, and in which it is difficult, or impossible, for this court to rightly determine the true situation. The part of the argument by the attorney for the state objected to purports to be in answer to something that was said by counsel for the defendant. We cannot, of course, under the circumstances, know what the argument by defendant's counsel was. We do know that sometimes counsel for defendant, in their zeal for their client, do make such statements as they think may secure an acquittal, whether it is within the record or not. The trial court heard all the argument and has a duty to perform in this respect and should unhesitatingly grant a new trial if in his judgment the

closing argument is outside the record and prejudicial. We have announced a rule in a number of cases that, because the trial court overruled a motion for new trial when such misconduct was one of the grounds, we would not interfere. There may be cases where the closing argument, as presented to us, seems so flagrant and prejudicial that we feel compelled to reverse, and it may be this is done in some cases where a reversal would not be had if we had all the facts, as did the trial court. It may not be improper to remark that in such cases, where the closing argument alone is reported, the prosecuting attorney and the trial court should look more closely to the record. The prosecuting attorney could make a showing, and the trial court a finding, that the closing remarks were in answer to statements by counsel for the defendant, or for some other reason not improper, if that be the fact, so that we may as nearly as possible have the case as the trial court had it.

II. As stated, there is no conflict in the testimony as to the entry by defendant into the dwelling-house in the nighttime. The appellant challenges the sufficiency of the evidence to sustain the finding of the jury that the entering was with intent to commit adultery, as charged in the indictment. The question was raised in a motion to direct a verdict, and by motion in arrest and for a new trial.

2. CRIMINAL LAW : burglary : intent to commit adultery : evidence : sufficiency of.

Several assignments of error are based upon this thought. The evidence was directed largely to this question, and it is the principal point argued. We are satisfied that the evidence is abundant to sustain the verdict at this point. Some of the circumstances relied upon as tending to show such intent are not disputed, while as to others there is a conflict in the testimony. It is the province of the jury to determine the matter of the credibility of the witnesses and the weight which should be given to their testimony, and the sufficiency of the evidence where there is a conflict is for the jury. It is for the jury to say which of the witnesses they will believe and

which they will disbelieve. *State v. Lightfoot,* 107 Iowa 344.

Under the circumstances, we deem it necessary to set out the substance of the testimony bearing upon this point, and this we shall do as briefly as may be.

L. G. Ruhl was forty-nine years of age, and his wife forty-four; they had six children, ranging from six to twenty-one years of age; they had been married twenty-three years. At the time of the transaction in question they lived in Belle Plaine. Before moving to Belle Plaine, Ruhl had been a farmer; after that he ran a feed barn, and teamed and worked on the railroad. Defendant was engaged in the real estate business. His wife and a younger child went to California about May, 1911, and had not returned up to the time of the trial so far as the record shows. From about June, 1911, to some time in 1912, defendant and his two young men sons roomed in the home of the Ruhls.

L. G. Ruhl testifies that since they moved to Belle Plaine, seven years before, he lived with his family and supported them; that up to the time defendant entered the home the relation of husband and wife existed between Ruhl and his wife and that they occupied the same room; that after defendant came to the home Mrs. Ruhl began to treat him (Ruhl) coldly and finally locked him out of her room. At this time defendant was occupying rooms in the house. Ruhl testifies that defendant and his (Ruhl's) wife were very friendly and that defendant seemed very attentive to her; that he would get novels from the library and read to her from them nights, in the presence of other members of the family at times, and at other times alone; that defendant would follow her from room to room in the house and up stairs and down in the basement, and that defendant called her a jewel; that the reading at night was of common occurrence, and that he called her a jewel at different times; that he would read to her as late as eleven o'clock at night; that he saw his wife in Hall's room with Hall, but that the door was open and there was no concealment of the fact; that he talked to defendant

in regard to his relations with Mrs. Ruhl at one time and said to him:

"Look here, Mr. Hall, don't you know there is talk around here about my wife and you? I don't want to ever catch you with my wife again. I want you to take your things now and move out. You know how ready people are to talk about anything. A man of your reputation ought to be more careful. He said he had as good a reputation as I had. I said, 'Mr. Hall, I don't think you have.' I says, 'I have never been accused of being mixed up with other women like you have heretofore.'"

That defendant did not leave the house at this time, after ordered to leave; that he did not know when defendant did leave, but it was while witness was away at work; that he was working in Deep River, twenty-five miles distant from Belle Plaine, in the summer of 1912; sometimes he would come home Saturday evening and go back to his work Monday morning; that he came home one night from Deep River—he thinks about August 29, 1912—and came through the back part of the yard of his home and saw the defendant lying in the weeds and blackberry bushes, which he says were about four feet high; that defendant was stretched out full length in the weeds; that this was about forty feet west of his house; that they saw each other about the same time, and defendant yelled and jumped, and they grappled; that they both "hollered," and defendant said, "He has got a gun on him; take it from him"; that a son of defendant came from the house and tried to take the gun from the witness, but witness said he would give the gun to the boy, which he did; that witness demanded to know of defendant what business he had there, and defendant said, "I came to see what you was doing"; witness says that is all he could tell; that they had some further words, and defendant went up the street. Witness says that at that time he complained to defendant of his relations with Mrs. Ruhl; that he told him very plain; that

he again told him to leave the place and stay away; that he said, "Now, Hall, tomorrow morning I want you to take everything out of here that belongs to you and get out and stay out." And defendant said, "I will." That witness went back to his work about three o'clock that night. This transaction is not denied. The son testified for the defendant to taking the loaded revolver from Ruhl at this time.

Witness testifies to another transaction: when he came home from Deep River Sunday evening after dusk, before the Fourth of July, he was informed by one of the children that his wife was at church; that he started up the street and saw his wife and defendant coming under the electric light, and the little girl some forty or fifty feet ahead; that he thought they were locked arms, but that they both denied it when later he accused them of it; that they came as far as the alley, and defendant said to her, "You go on," and she went on ahead to the little girl, and defendant stopped in the alley a little while and then went down the street; that defendant did not know witness was there at that time; that in the spring of 1913, until after July 4th, he was working nights at the freight depot, except a few days he was working in the day; that one night in June, 1913, he worked during the day and was at home at night; that he did not room with his wife after the fore part of February, 1912; that he took another room and his wife remained in the one they had occupied; that after his wife refused to room with him a hook and eye was put on the inside of the sliding door to her room; that on the night of June 17, 1913, which is the time the alleged crime was committed, that he went to bed about nine o'clock, but it was so warm in the room that he went out in the yard to lie down on the lawn; that he took a nap and woke up about ten o'clock and saw a man dart along in the shade of the trees, and that he knew who it was; that, instead of going to bed, he went into the basement to wait and see what the man was prowling around for, as he puts it; that he thought he saw defendant about ten o'clock that night on

his premises; that after he went to the basement he waited a long time by the door that came in from the outside; that about one o'clock in the morning a man darted in the basement all crouched up and stood there maybe two minutes, without seeing witness, and got out the cellar way and raised his hands as though he was going to raise them on the window sill; that the window he saw him raise his hands to was the sill in his wife's room above the basement; that from ten o'clock until one o'clock that night, while waiting, he heard someone walking across the floor back and forth in his wife's room.

"Q. When Hall raised his hands to the sill of your wife's window, tell the jury what he did afterwards.

"A. Well, he seemed to, as soon as I got up off the wood and picked up the axe, and I suppose I made a little noise, and he seemed to turn around this way to look down and see what the noise was, and I struck at him with the axe then, and he came down in the cellar way and we grappled there and had quite a tussle. As I saw Mr. Hall's hands stretched out to the sill at the window and I struck at him, he jumped in the cellar way and grappled with me, and he got the axe away from me, he got me by the throat and got me back against the cellar wall and choked me until my daughter came. He told me to shut up and not make any noise. The window that I have testified Hall was reaching for in my wife's room is just west of the sloping entrance to the cellar and is four feet or more from the ground. I couldn't say whether the window was raised or lowered during the time I was in the basement. Hall is rather a tall man, and when he went out to this west window and was reaching up I was right there in the cellar doorway. I had the axe in one hand; he was a little sideways to me, reaching up; I stood there scarcely any time at all watching him. When I made the move he seemed to turn around to see where the noise was, and I struck at him with the axe. I hit him with the axe, but don't know where.

I was trying to hit him. After I struck him with the axe he grappled with me right in the entry way and we clinched on that slope, and when we got inside the door he had the axe from me before my daughter came down. Some of the young folks were out on the lawn or steps in front of the house at ten o'clock and up to one o'clock. I called for my daughter, Ruth, and she came while defendant had me by the throat. She jumped down in the cellar way and struck him in the face and he let loose of me then. Defendant had hollered for Mrs. Ruhl. She came right down; and he says, 'Oh, don't leave me, Mrs. Ruhl.' Will Brand also came into the basement during the trouble. The furnace room is west of the wood room where I was. The stairs lead up from the furnace room to the first story. There is an electric light in the furnace room and the switch is at the head of the stairs on the first floor. My wife came down into the furnace room through the inside stairway. I think Mrs. Ruhl got there a little before the children. I asked him two or three times what his business was there and what he wanted, and he wouldn't tell me anything, and we commenced cursing each other. He went out of the cellar with Will Brand."

Witness describes the house and says a person could easily enter his wife's room by entering the cellar door and going up stairs. The house is a large house, sixteen or eighteen rooms. On cross-examination, he testifies that defendant came in the basement with a rush, in a crouched position, and that at that time the basement was dark and defendant could not have known at first that witness was in the basement; that after defendant had been in the basement about two minutes he went out and to the window and witness raised up and got a little closer to the cellar door; that he followed defendant right to the doorway where he could hear. That up to the time witness struck defendant with the axe defendant had not said anything and had not called anyone nor thrown anything against the house or window or anything of

that kind. He testifies that he and his wife had not had any trouble for five years before February; he is not certain whether his wife told him about February that his being intoxicated with Burns and his brother was the reason for her refusing to allow him to stay in her room any longer. He says: "That drinking business was nothing but a little talk put up for an excuse." Witness testifies that after the conversation he had with defendant in which certain things were called in question, he told defendant he had had trouble with his wife and asked defendant to talk to her and use his friendly offices to try and fix up the family difficulties between Ruhl and his wife.

"I knew he had upset things, I thought maybe he could right them again if there was any manhood to him. I knew there was talk about defendant and my wife, and at one time I told him there was talk; I did not see defendant touch my wife or caressing or fondling her. At one time in February my brother brought whisky to the house, and he and I and Burns and Arthur Hall, a son of defendant, drank it; my wife censured me for it the next day; it was after that, but I don't know whether it was at that time, it was following it anyhow, that she said I should stay out of her room; defendant and I had no words of any kind until July, 1912, that I remember of. I saw her do things that I didn't think looked proper to me. At the time of the encounter between defendant and myself I did not hear my wife get out of bed; I did not hear the cellar door open; I think the first I knew was when the light was turned on."

On re-examination, witness says he never saw defendant kiss his wife, and that when he said he did not see any improper relations between them he meant no adulterous relations; that he has not drunk to exceed a half pint of intoxicating liquors in two years; that he has never been a drinking man to any extent: that he has not been drunk in ten years: that they used to keep a little beer during the summer in

hot weather and that his wife drank some of it. He testifies that his wife was a good mother to the children during the time they were married and, as far as he knows, was a woman of good moral character. That he never accused her of want of chastity. He says further:

"That night after I found Hall in the basement I started down town, and I hesitated. 'Now,' I says (to her) 'look here, if you want to drop this thing and give up that man and shun him, we will drop everything and live like we used to live together and say nothing about nothing.' At that time I was willing to drop everything, willing to resume my relations with her of husband and wife, regardless of anything that may have happened between Hall and her."

Witness testifies that at a prior hearing he testified that defendant was not trying to get into the building from below when he struck defendant, but that when defendant put his hand up on the window sill he supposed defendant was going to jump in the window.

Ruth Ruhl, a daughter of L. G. Ruhl and wife, twenty-one years of age, testifies that she was at home on a vacation June 17, 1913, and that she and Brand and some others were out on the lawn northeast of the house earlier in the evening, and that she and Brand went into the basement, and corroborates prosecuting witness as to the transaction in the basement. That while sitting on the embankment northeast of the house she could almost see the north of the house; did not see anybody before she went into the basement; there are some evergreen trees and a hedge growing north of the house and come almost up to the cellar way; that there is a little bank near the door on each side of the entrance to the basement which comes right up to the door, and a brick wall on the sides of this entrance. A part of the young people went away between eleven and twelve o'clock, and before they left they were having a jolly time talking, etc.

Will Brand, who followed Ruth into the basement, testi-

fied substantially as the others as to the transaction in the basement, and further, that the light was turned on when he was about half way to the house; went into the basement from the north; that when he first went in defendant turned from Ruhl and picked up a stick of wood and witness took it away from him; Mrs. Ruhl was standing in the doorway; when he first went in he thinks Mrs. Ruhl was coming down the stairs; that before the light was turned on he heard Ruhl asking defendant what he was doing there breaking up his home; did not hear any response from defendant. While in the basement witness asked Mrs. Ruhl to go up stairs; she shook her head and would not go; when witness asked Mrs. Ruhl to go up stairs defendant stepped toward her and told her not to go, not to leave him, and she said she would not. When defendant stepped toward Mrs. Ruhl, Mr. Ruhl stepped towards defendant and tried to hit him and told him to get away from his wife, called him a name, and witness stepped between them again; he took defendant by the arm and took him out of the cellar to the sidewalk; while doing this defendant told witness that he came for his son's straw hat, or Stanley's straw hat; Stanley was a son of defendant; when they got to the sidewalk defendant asked if his head was cut, and witness told him not very bad, and told him he had better leave or Mr. Ruhl would kill him.

Witness Ed Hickey testifies to seeing defendant and Mrs. Ruhl together in July or August, 1912. He testifies as to this transaction, substantially: It was about three o'clock in the afternoon Sunday. I was going to what they call the Park Addition to Belle Plaine. It was then the Bowers orchard. I met Mr. Bowers in his orchard. We together walked to the north end of his land which is bounded by Twenty-first Street, from there we walked to the corner of his land, following along an osage fence, and I saw Mr. Hall and Mrs. Ruhl in the center of the road. Bowers was with me. At that time that park was not built up; the last house was Nineteenth Street. North of this place was all farm land, and on the

south is a twelve-acre orchard.  At the place they were the road was not used very much; on each side the road is grown up with underbrush and weeds; when we came in sight Hall moved to the north of the road and entered the underbrush or weeds and concealed himself, or nearly concealed himself; his body was down in the weeds.  Mrs. Ruhl walked immediately east down the road.  They immediately separated when Mr. Hall turned north and Mrs. Ruhl east.  When I first saw them they were a few feet west of the bridge; they were not standing any closer together than people would naturally stand when they were talking together.  I did not observe anything else but their standing talking.

Witness Bowers corroborates Hickey as to this transaction, and says further, that when defendant and Mrs. Ruhl separated they went in opposite directions; that there was shrubbery there and tall weeds probably four or five feet high. After Hall crossed the street, or road, he disappeared.

Mrs. Ruhl, testifying as a witness for the defendant, gives this version of the transaction just referred to.  In explanation of their meeting, she says:

"I always had lots of flowers.  He had asked me for a bouquet to take to a sick lady, and I said I was going to a neighbor's and if he came to the house, there had been so much said, I would just hand it to him; as I went to the corner he was there.  I went on and I don't know where he went to, but there was nothing said where we should meet. There was no talk of a private nature between us.  I went to this neighbor's a short distance beyond the bridge.  I saw Hickey and Bowers when I left my house, saw them most of the time I was going there; I can't say whether Mr. Hall was rooming at our house at that time or not; I think he was."

Counsel for defendant say that, as there was no impropriety shown between defendant and Mrs. Ruhl at this time, there was no occasion for defendant hiding in the weeds, and say that it was a foolish thing for defendant to do.  But we

are impressed with the thought that, taking all the circumstances in the case together, the argument that it was a foolish thing for him to do is not a complete or satisfactory explanation of his conduct at that time.

Whitfield Ruhl, a son of the Ruhls, corroborates his father as to some of the transactions occurring at the home while defendant roomed there; heard defendant call his mother a jewel more than once. He knows of defendant reading to his mother at a late hour of the night while defendant was rooming there more than once. On cross-examination, says that his relations with his mother are good and that he respects her; that when defendant was reading his mother seemed to be listening, and the others present were not always doing so; that they were sometimes reading something else. He testifies that on one occasion he saw defendant and Mrs. Ruhl coming out of a room up stairs in the daytime; did not know when they went in the room, but saw them come out together; that his mother took care of the room; that he was away from home much of the time in the last two years.

Frank Boody, a farmer, living seven miles in the country from Belle Plaine, testifies that he had known defendant for twelve or fifteen years; that he saw defendant on the train in April, 1913, when they were coming from Marshalltown; that he got off the train at Belle Plaine, and saw defendant up the street after he got off; it was between twelve and two o'clock in the morning; that he got his horse and buggy at the feed shed and overtook defendant as he was going north; that the last he saw of defendant he was on the premises of Mr. and Mrs. L. G. Ruhl; that he was going up the street and turned on the premises; saw him after he got on the premises; that it is quite a little ways from the depot to the Ruhl house. This transaction is not denied by anyone.

Witness Brown says that he passed the Ruhl property about July or August, 1911, about ten or eleven o'clock at night, and saw defendant and Mrs. Ruhl tolerably close together on the lawn at the Ruhl home, about fifty feet from

the house; that Mr. Ruhl was not there, and there was no one else there close to them; there were other people on the sidewalk about fifty feet from them. Defendant and Mrs. Ruhl were about six or eight feet from the walk on the edge of the lawn; they were about three feet apart.

"I spoke to Hall and he joined me and we went out in the street. It was not a very pleasant evening; it had been raining and stormy."

Witness Osborn testified that he lived about six blocks from the Ruhl home; that about the year 1910, at about eleven o'clock at night, as he and his wife were going home from town, his wife became frightened at someone

3. WITNESS: evidence: partial or indefinite identification of person: admissibility.

in the shrubbery by the side of the walk, thinking it was a drunken man; that they went on home, and witness came back to the place in the corner of the yard behind an evergreen bush and some other shrubbery and stood there and listened and heard people talking; that he heard what he took to be a lady saying, "Quit," several times, and heard a man say that the Good Lord would forgive them for something; "I don't know what; can't word it just exactly as he did; saw a man and woman; they left that place and walked away together, going west. The Ruhl home is west of there, north and west. There was an electric light on top of the hill. I saw the man and woman at a distance under the electric light. I recognized the man and woman in my own mind as Mr. Hall and Mrs. Ruhl."

On cross examination, says that he told Mr. Snyder (counsel for defendant) that he could not swear that the parties he saw were defendant and Mrs. Ruhl, only in his own mind.

"Mr. Snyder asked me what I knew about it, and told me that Mr. Hall denied ever being there, and I says, 'Mr. Snyder, if it wasn't Mr. Hall and Mrs. Ruhl, it was their

ghosts.' I told him I wouldn't swear only in my own mind, as what I believed. I told Mr. Snyder at that time that I had been at Mr. Tobin's office;'' says he told Mr. Tobin that he was not sure as to the identity of the persons; that Tobin told him that he did not want witness to say anything except the absolute truth.

"At the time of the conversation with Mr. Snyder, he was acting as my attorney, and is now. I was perhaps fifty or sixty feet from the parties when I heard the talk between them. I heard plainly what I have testified to, but don't know as I heard every word they said. When I saw them under the electric light they were not quite a block distant. They were going from me, with their backs to me. I could not see their faces, and did not at any time. My recognition is based only on their forms. The electric light was an incandescent light, not an arc, and is on a pole in the middle of the road. I told my wife who the parties were at the time. I do not say who it was now. I said who I believed it was. I will not swear now positively that it was Mr. Hall or Mrs. Ruhl.''

It is contended by appellant that the court erred in admitting any part of the testimony of this witness. While the witness did not positively and definitely identify the man and woman he heard talking behind the shrubbery as the defendant and Mrs. Ruhl, and under the circumstances could not do so, still the weight of his testimony was for the jury. It is very material, if true.

The witnesses testifying for the defendant were Mrs. Ruhl and two sons of the defendant.

Mrs. Ruhl testifies at length and explains some of the circumstances referred to in the evidence, and contradicts her husband, son and daughter, and other witnesses, as to the circumstances testified to by them tending to show improper conduct; gives her version of the drinking habits of her husband and his treatment of her; says that she had no improper relations with defendant at any time; says that when her hus-

band treated her badly she took care of herself; that in February, 1912, she put a hook and eye on the inside of the door of her room and refused to permit her husband to occupy the room with her after that; that this was because of his drinking; does not know of his drinking the last year; that defendant had nothing to do with her breaking off her relations with her husband; that at times her husband was present when defendant was reading books and made no objection, and even asked defendant to read; denies that she was ever in defendant's room with him; testifies that there was no arrangement or previous understanding with defendant the night of June 17, 1913; that she did not know he was in town and had not seen him since August before; that on the night of June 17th she was up after she went to bed; that her daughter had come up on the front porch and she thought that the daughter had come in for the night, and that when the daughter came in witness got up and went out because she always did when the daughter came in, she would get up and go out and sit down and talk a few minutes before she went to bed; that on this night she went out and turned on the light and did not find her daughter; that she had gone to bed and had been dozing; denies that defendant ever called her a jewel; says that she did not treat her husband coldly after Mr. Hall came, except as her husband would make her do so.

Arthur Hall, a son of defendant, testified that he lived at the home of the Ruhls when his father did; that he saw no improper conduct between his father and Mrs. Ruhl.

Cluley Hall, another son of defendant, who lived at the home of the Ruhls during the summer vacation of 1912, and another vacation, testified that when he first went there he thought it was just like home, everything was so pleasant and nice, and so continued until about the first of August, or latter part of July, when he heard there was trouble; testifies to the revolver transaction between defendant and Mr. Ruhl, and that he took the loaded revolver from Mr. Ruhl.

We have not set out all the evidence introduced on behalf of the defendant nor as fully as we would if we were the triers of questions of fact, but enough to show that if the jury believed the State's witnesses, as they had a right to do, it is enough to show adulterous disposition or feeling between defendant and Mrs. Ruhl prior to the time of the transaction in question and enough to sustain the finding of the jury that the purpose and intent of the defendant in entering the building was adultery. There is nothing in the evidence tending to show any other purpose or intent, unless it is his statement that he went in to get his hat. There is evidence in the record to show that defendant did leave some things at the Ruhl home when he left, but they were up stairs, or in the attic. The jury could, of course, have believed the defendant's explanation, if they had been credulous enough to do so, but we think they were justified in finding that he did not go into the basement of the dwelling house of another person at one o'clock in the morning for the purpose of getting an old hat he had left there. Of course, there are circumstances shown which of themselves would not be sufficient to show improper conduct, and might be proper enough; but, taking the circumstances all together, we are satisfied that the evidence was sufficient. If the State's evidence is true, defendant and Mrs. Ruhl clearly exceeded the bounds of propriety. She knew that people were talking about her and about the defendant, and, after her husband had protested to both of them in regard to the matter, they both continued in the same way.

3. Appellant contends that the court erred in failing to give an instruction on the question of abandonment of any criminal intent on the part of the defendant when he left the basement of the Ruhl home and that the evidence shows he did not re-enter said building that night in pursuance of the crime charged, to wit, adultery. But we think there is no evidence tending to show an abandonment until after defend-

4. CRIMINAL LAW : burglary : abandonment of criminal purpose.

ant was struck with the axe by Ruhl. Up to that time defendant had not seen and did not know of the presence of Mr. Ruhl, and the whole transaction occurred in a brief space of time and should all be considered as one transaction. The window which it is claimed defendant was reaching up to was close to the basement entrance, and, as stated, there is nothing to indicate that defendant abandoned his purpose to enter the house or his intention to commit adultery until Ruhl struck him with the axe.

4. It is contended by appellant that the court erred in use of the words "all contrary to law" in the first instruction. The court did not set out in the instructions a copy of the indictment, but stated only the substance of it, and stated what the charge was, and that the defendant was accused of entering the building with intent to commit a public offense, to wit, adultery, etc., all contrary to law. The indictment charged that the acts alleged therein were all contrary to the form of the statute in such cases made and provided, etc. The statement complained of in the instruction is no more than setting forth this same idea, and the objection thereto is without merit.

5. CRIMINAL LAW: instructions: setting forth charge: use of legal phraseology.

5. Instruction No. 5 is complained of. It is as follows:

6. CRIMINAL LAW: instructions: quoting statute: superfluity.

"The statute of this state provides that if any person, with intent to commit a public offense, in the daytime, break and enter, or in the night-time enter, without breaking, any dwelling-house, he shall be punished as by law provided."

It is said that including the words "breaking and entering in the daytime" is a part of the charge in this case, which was for an entirely different offense. The instruction is in the language of the statute, and, while the words referred to were not necessary, it was merely superfluous and, as the

other instructions fully covered the law as applied to the issues, there could be no prejudice to the defendant.

The appellant also complains of this instruction, in that, as he claims, it assumes as a matter of law, that any entering without breaking in a dwelling-house shall be punishable by law, and that such is not a correct statement of the law. But the first part of the instruction refers to entering with intent to commit a public offense, so that we think the instruction is not vulnerable to the objection made. This matter was more fully explained to the jury in other instructions. It has been held that in an indictment for burglary it is not necessary to set out the offense which it is charged the person intended to commit with the same particularity as for an indictment charging such intended offense. *State v. Mecum,* 95 Iowa 433, 438; 4 R. C. L., page 436.

7. CRIMINAL LAW: instruction: all elements not included.

What we have said in the last paragraph applies, in part at least, to the criticism of Instruction No. 9. It was not necessary to charge in the indictment the name of the person with whom it is claimed the defendant intended to commit adultery. In this instruction the court stated to the jury that the indictment does not name the person, but that the State presented its case upon the theory that the person with whom defendant intended to commit adultery was Mrs. Anna Ruhl, and then stated what was necessary to constitute adultery, and that it must be shown beyond a reasonable doubt that defendant did enter the building as charged, and with the intent to commit the crime of adultery with Mrs. Ruhl. We have given only the substance of the instruction. The evidence, as we have already stated, was directed almost entirely to this question as to their relations, and there is nothing in the record to point to any other person.

8. INDICTMENT AND INFORMATION: burglary: intent to commit adultery: name of other party.

7. Appellant's next contention is, that the court erred

in the sentence pronounced, wherein he sentenced defendant to "hard labor" for not more than one year, etc. The claim is that there is no provision in the Code as to sentence to hard labor for the alleged offense. Code Secs. 5652, 5657, and 4791 seem to be against appellant's contention.

9. BURGLARY: sentence: hard labor.

8. The seventh assignment of error is, that the court erred in giving Instructions 6, 8, and 9, for the reason that said instructions, taken together, contemplate that the offense of entering without breaking a dwelling-house in the night-time applies to crimes against the person, when as a matter of fact and law, said entering was not an offense against the person, or against chastity but is against property, and is found in the title of the Code relating to offenses against property, and that, therefore, the giving of said instructions charging adultery as the intended offense was not correct, and rather it should have been charged as a larceny.

10. BURGLARY: entering: intent: "public offense": adultery.

There was no evidence tending to show that defendant intended to commit larceny, and it is a question of proof, although some of the cases say that there is a presumption that the entering is with intent to steal. But the substance of Instruction No. 6 is that before there can be a conviction the jury must find, first, that defendant did enter the dwelling-house of L. G. Ruhl in the night-time; second, that such entering was with the intent on his part to commit the crime of adultery; and third, that said dwelling-house was the dwelling-house of L. G. Ruhl; that every element must be established, and that if the jury entertain any reasonable doubt upon any element, they should acquit. Instruction 8 states that intent may be shown by circumstances, and the ninth instruction has been already referred to.

Code Sec. 4791, which the court quoted in part, has been already set out. It provides, in substance, that if a person enter a dwelling-house in the night-time, with intent to commit a public offense, he shall be punished. Adultery is a

public offense. Entering with intent to commit adultery is punishable as burglary. *State v. Mecum, supra.*

The evidence sustains the verdict, and there is no reversible error. The judgment is, therefore,—*Affirmed.*

LADD, C. J., EVANS and WEAVER, JJ., concur.