THE STATE OF IOWA v. HARRY BECKER, Appellant.

**Criminal law:** ROBBERY: EVIDENCE.  In this prosecution for robbery
1  the evidence is reviewed and held sufficient to take the question of defendant's guilt to the jury.

**Same:** INSTRUCTIONS: REFUSAL OF REQUESTS.  Refusal to give a re-
2  quested instruction on a subject fully covered by those given by the court on its own motion is not erroneous.

**Same:**  While it is well to advise the jury that evidence of bad moral
3  character of defendant is only to be considered as bearing upon his credibility· as a witness, in the absence of a request for such instruction, was not a matter of which defendant could complain; especially where the court clearly told the jury how to weigh the evidence of a witness whose general character had been assailed.

**Same:** NEW TRIAL: BIAS OF JUROR.  Bias of a juror as indicated by
4  his conversation out of court, when made a ground for new trial

and supported by the affidavits of two persons, which were denied by the juror, presented an issue for determination by the trial court.

**Same:** SUBMISSION OF ISSUES: INCLUDED OFFENSES. The evidence on this prosecution for robbery is held to raise the issues of assault with intent to rob, and simple assault, which should have been submitted as included offenses.

*Appeal from Jackson District Court.*—HON. F. D. LETTS, Judge.

TUESDAY, MARCH 11, 1913.

FROM judgment convicting him of robbery, the defendant appeals.—*Reversed and Remanded.*

*J. C. Murray* and *Welch & Welch,* for appellant.

*George Cosson,* Attorney-General and *John Fletcher,* Assistant Attorney-General, for the State.

LADD, J.—I. The defendant was convicted of the crime of having robbed one Anderson, and challenges the sufficiency of the evidence to sustain the finding. It appears that Anderson reached Maquoketa, some thirteen miles

1. CRIMINAL LAW : robbery: evidence.

from his home, shortly before six o'clock p. m., July 15, 1911, and, after putting his team in the barn of the Chicago House and getting a drink at Hoffman's Saloon, took supper at Sprank's Hotel. He then visited Smith's Saloon, where he drank two or three glasses of beer and proceeded to Hoffman's Saloon. There he met defendant and with him had a "couple beers," and later had another in which Woodhurst joined. The three then went to Smith's Saloon, where they partook of the same beverage once or twice more and returned to Hoffman's Saloon, but, finding it about to close, they proceeded to Peterson's Saloon, where Anderson and defendant each treated, and the latter obtained a pint

bottle of whisky, and the former a picnic bottle of beer. Later on, the three, with Hutchins, went to Paine's Restaurant, where Anderson had beans and coffee and the others a regular supper; Anderson paying the bill. They then walked about until near a telegraph pole, where, with the assistance of Bodkin, and perhaps others, the picnic bottle of beer was disposed of. Whether Anderson produced the bottle of whisky on his own motion or on inquiry is in dispute, as is also whether he joined in drinking therefrom. But there is no controversy about it being drank in Sprank's alley. Anderson testified that he had none of it, but walked ahead of the others to the barn where his horses were, and that, as he was standing back of them, he heard some one step on a plank at the doorway (quoting):

I didn't have time to turn, just turn my head, and saw Becker and Woodhurst come in the door, and one of them grabbed me around the arm and the other around my neck. They said nothing. I said, 'Boys!' I thought they was going to wrestle. I said: 'Don't rob me. If you want a dollar or two, I will give it to you. Don't rob me.' And they held something to my nose, and the last I remember they threw me down and I was laying here. I don't know how long before I got up. They had something to my nose that smelled awful, a handkerchief. They put it to my nose. I could not move. My hands were back, and I could not move; they were so strong, and I am little, and an old man, and he had his hands in my pocket. I don't know who put his hands in my pocket; one of the two. When I came to, I missed my pocketbook and all of the money which I lost and the money I had in my pocketbook and my checkbook. The same pocketbook and what money I had in Paines' Lunchroom. Somewhere around $35 or $40, made up in silver and bills. Three tens and a five and had a ten changed or something. I will not swear it was ten or a five that was left. That much silver; I don't know how much silver; I had quite a little.

In the morning, his pocketbook, open and empty, was found near by, as· were also his checkbook and false teeth.

He then sought to have the money restored by the persons named, but, failing therein, this prosecution was begun. The defendant and Woodhurst denied having been at the barn at all, and the former testified that one Frost accompanied him home from the alley immediately after the whisky had been consumed. In this he is corroborated by the testimony of Frost and defendant's sister, who said she heard some one talking with defendant on the sidewalk when he reached home, and she, as well as his father and mother, fixed the time at about 12:30 o'clock. Evidence of contradictory statements by the prosecutor was adduced, and to what extent he was under the influence of liquor was in controversy. Also, there was evidence tending to show that the general moral character of defendant Woodhurst and another witness was bad. From the recital, it is apparent that the issue raised by defendant's plea of not guilty was for the jury. As contended, Anderson's testimony was not corroborated, but the law does not require that it should have been. Though he had consumed considerable beer and might have been found to have taken whisky as well, the jury could have concluded that he was not under the influence of liquor sufficiently to deprive him of capacity to appreciate what was going on about him. Defendant and Woodhurst denied all knowledge of the transaction, but their moral character was assailed as being bad, and the jury might have rejected their testimony. The evidence of members of his family was only important when connected with that of Frost, who claimed to have accompanied the defendant from the alley to his home, and if the testimony of Frost were to be rejected, or if it were concluded that he met defendant after the alleged robbery and walked home with him, then the testimony as to the alibi was quite as consistent with guilt as with innocence. In any event, the credibility of the witnesses was for the jury, and, that body having concluded that the prosecutor's account

of the transaction at the barn was true, this court ought not to interfere.

II.   Complaint is made of the court's refusal to give the fifth instruction, saying in substance that, unless money was taken from Anderson's person, there must be an acquittal.

2. SAME: instruc-
tions: refusal
of requests.

It might well have been given, but there was no error in its refusal, for that it was included in the ninth and seventeenth instruction read to the jury. . In the former, the jury were told in the most explicit terms to ascertain whether defendant took or was concerned in taking the money or any part of it from Anderson, and that if they entertained any reasonable doubt on this point he should be acquitted, and the latter refers to the circumstances with sufficient explicitness which were to be considered in determining that issue.

The sixteenth instruction advised the jury with clearness how to weigh the testimony of witnesses whose general moral character had been assailed as bad, but did not say that the evidence of bad moral character could not be considered for any other purpose.   Because of this omission, the instruction is criticised.   It is preferable to caution the jury in this respect where there has been an attempt to impeach defendant's character as bearing upon his credibility as a witness; but there was no request for such an instruction, and, this being so, error cannot be predicated on its omission.   *State v. Olds*, 106 Iowa, 110.

3. SAME.

III.   One of the grounds of the motion for new trial was that a juror while serving as such, in a conversation out of court, had indicated such bias or prejudice as to indicate that he was disqualified notwithstanding his statement to the contrary on *voir dire*.   The affidavit of two persons to this effect was denied by the juror.   The issue was primarily for the district court, and with its conclusion we are not inclined to interfere.

4. SAME: new
trial: bias of
juror.

IV.   The court submitted but one included offense, that of larceny from the person, and omitted to submit to the jury

whether the defendant was guilty of assault with intent to rob, assault and battery, or simple assault.

5. SAME: submission of issues: included offenses.

In this there was error. It will be recalled that Anderson's pocketbook was found in the morning open and empty. Did it have anything in it when he went to the barn to see his horses? He had been making the rounds of the saloons, and on his own statement had been drinking excessively. Concerning the money on his person, he testified that on the second visit to Smith's Saloon "seems that I got a $10 bill changed there, but I won't swear to it—did not take out my pocketbook," and further that, when at Paine's Restaurant, "took my pocketbook out there and paid for the meals. Had some bills in my pocketbook at that time. I got a silver dollar from the other pocket. When I came from town, I had three $10 bills, a $5 bill that I know of and some silver. Don't know how much I had in there at the restaurant there; $35, $36, or maybe $40, I had in the restaurant there. Maybe I spent up to that time a couple or three dollars, maybe not that much, I think about three dollars, and I paid for the supper. I put my pocketbook in my pocket there, and that money was in it." Barnes testified that, when in Peterson's Saloon, some one requested Anderson to buy a picnic bottle of beer, when Anderson responded: "I am busted, Becker, you buy it, and I will pay for it. I gave my girl $10 this morning." And that Becker bought the beer. Bodkin relates this circumstance by saying that Anderson said to Barnes: "If you will buy the picnic bottle, I will pay you when I come up. I gave my girl $10 and have no money." Enough of the testimony has been mentioned to indicate that Anderson was uncertain as to the amount of money he had, and that the credibility of his testimony of having any was somewhat impaired by contradictory statements. He had been carousing from the time he reached town until shortly after the alleged robbery, and the jury might have doubted whether any money had been taken from him, and have convicted the defendant of

assault with intent to rob. Moreover, he testified that he first supposed the purpose was to wrestle with him, and, although he thought something was placed at his nose, a physician's testimony tended to show that an anæsthetic administered in the manner described would not prove effective. He was in a condition which might induce hallucination, and we think it was also open to the jury to reject the charge of intent to rob and find the perpetrators of the offense, if any there were, guilty of assault only. In omitting to submit these included offenses to the jury, there was error. *State v. Duffy,* 124 Iowa, 705.

The judgment is reversed, and the cause *Remanded.*