STATE OF IOWA, appellee, v. EDWARD EBELSHEISER, appellant.

No. 47509.

(Reported in 43 N.W.2d 706)

AUGUST 1, 1950.

REHEARING DENIED JANUARY 9, 1951.

Joe W. Griffin, of Ottumwa, F. M. Beatty, of Sigourney, and Life & Davis, of Oskaloosa, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Samuel O. Erhardt, County Attorney, for appellee.

MANTZ, J.—Forty-three errors are assigned covering nearly twenty. printed pages. They are argued in twenty-six divisions. They overlap and repeat and as usual all do not merit the same consideration.

Defendant was convicted of second-degree murder of his sister Dorothy's husband, Earl Robertson. The Robertsons and Mrs. Robertson's widowed mother, Mary Ebelsheiser (eighty-seven). lived on the Ebelsheiser home farm a mile or two south of Hedrick in Wapello County. For convenience we call it the "Robertson" home. The widow-Ebelsheiser owned a life estate in it. Dorothy's sister, Mary Roop, lived in Hedrick, defendant at Martinsburg, about three miles east of Hedrick, and Walter, his brother, at Bladensburg, some ten miles away to the southeast.

On the afternoon of July 27, 1948, Dorothy and her sister, Mary, had a fight at the Robertson home. There had been trouble over family affairs, not necessary to go into in detail. Thereafter Earl and Dorothy drove to Ottumwa and filed information charging Mary with assault.

That evening the sheriff and deputy drove out to the neighborhood with the warrant for Mary's arrest. At the Robertson home they met defendant who told them the Robertsons were not there. As they left the place however they met Earl and Dorothy in the road and had some conversation from which they learned Mary Roop was in the house, whereupon they returned to serve the warrant.

Pursuant to some telephoning, defendant had come to the Robertson home, found his mother was all right, learned from Mary Roop of the trouble the sisters had had in the afternoon,

and that she wanted him and Walter to "straighten" it out. He and Mary had then driven into Hedrick to her home and defendant caught a ride to his home in Martinsburg where he changed his clothes and put a gun in his pocket. A neighbor drove him back over to the Robertsons. This was before the arrival of the officers.

Meanwhile Walter, down at Bladensburg, had received a message to come to his mother's place. He first drove to defendant's home at Martinsburg, learned defendant was already gone, and then drove over to his mother's where he arrived after Mary and defendant had left. The mother was alone. Mary soon came in and he learned of the afternoon fight between the sisters. Thereafter defendant arrived. Mary made some supper arrangements and Walter drove to Hedrick for sandwiches.

The sheriff and deputy arrived in Walter's absence. The warrant was served on Mary after Walter returned and Mary then went to her own home in her car with the deputy sheriff where arrangements were made for her bond. The sheriff followed, leaving defendant and Walter there.

After talking a short time with their mother, the men drove to Hedrick (leaving their mother alone) and had supper at the Roops. They then came back out to the Robertson home. Earl and Dorothy had not yet come in. The men visited with their mother in the living room.

Dorothy and Earl arrived later, she remaining in the kitchen, Earl first going upstairs. The evidence is of course conflicting as to events after the brothers called Dorothy into the living room and Earl came down and joined them. We are not trying the case de novo but give enough of the background to enable us to consider the assigned errors. Only decedent, Dorothy, the two brothers and aged mother were present. Only Dorothy and the two brothers testified. It was for the jury to determine who was the aggressor in the events that followed.

It seems undisputed that Walter left his own chair and went across the room to Earl's chair. Dorothy says he "rushed over to Earl's chair with his fist doubled up and hit Earl in the side of the head" and that Earl reached for his own gun in his pocket. The other two witnesses say Walter "just walked" across the room gesturing with his finger and that Earl pulled

his gun, stuck it into Walter's ribs (or stomach), clicked it and then swung and pointed it at defendant.

In the ensuing meleé defendant fired the fatal shot. There was some personal encounter in which all four (not including the mother) participated. According to Dorothy's account, even after Earl fell the brothers dragged him out in the room and defendant kicked him in the head and face saying "he is not dead yet."

Defendant testified that when he fired, Earl's gun was pointed at him and he was "terribly scared"; that after he fired Earl came at him and that they struggled; that Earl struck him over the head with his (Earl's) gun and that Walter finally disarmed Earl while holding Dorothy off.

Subsequently a doctor was called and Earl was found to be dead or dying. It was then shortly after eleven o'clock.

■ I. When the sheriff arrived on the scene after the tragedy he asked defendant and Walter where the gun was that killed Earl Robertson. He testified he received a gun from each. On cross-examination defendant sought to show that when Walter handed the witness the gun he (Walter) said it was Earl's gun. The court sustained objection to it.

Defendant also sought to go further in cross-examination of the sheriff and to elicit from him the entire story of what defendant and his brother told him during his investigation as to what had occurred that evening. Objections were sustained on the ground the statements were in part hearsay and in part self-serving.

Complaint is now made of these rulings. We do not understand defendant to contend the statements were part of the res gestae. He relies rather on the rule, both common law and statutory (sections 622.19 and 622.20, Codes 1946 and 1950) that when part of an act or declaration or conversation is shown on direct examination the rest may be inquired into and shown on cross-examination. Reeves v. Lyon, 224 Iowa 659, 277 N.W. 749, citing Baker v. Des Moines City Ry. Co., 199 Iowa 1256, 1258, 202 N.W. 762, 763.

The record is not clear enough to permit us to determine how much of the attempted cross-examination related to the transaction in which the sheriff demanded and received the guns.

We think whatever was said or done at that time as a part of or explanatory of the act of delivering the guns could be properly drawn out on cross-examination. See the Code sections above-cited and Courtright v. Deeds, 37 Iowa 503, 514, 515, which refers to section 3992, Revision of 1860, identical with present sections. See also 70 C. J., Witnesses, section 795, pages 622, 623, and 58 Am. Jur., Witnesses, sections 629, 632 (notes 18, 19).

However, defendant and his brother later testified fully as to the identity of the guns and as to the events leading up to the shooting. It is inconceivable therefore that any prejudicial error resulted from the limitations placed on the cross-examination of the sheriff. See, as bearing on the question, State v. Hofer, 238 Iowa 820, 836, 28 N.W.2d 475; 58 Am. Jur., Witnesses, section 671; State v. Sedig, 235 Iowa 609, 616, 16 N.W.2d 247.

■ II. Complaint is made of the admission of the testimony of the sheriff and his deputy concerning their conversations with Earl Robertson out in the road some hours before the fatal event, to the effect that he (Earl) was afraid to go into the house when defendant and Walter were there and wanted the officers to get them away before he went in. This was shortly before Mary Roop's arrest.

The statements were admissible as part of the res gestae under well recognized rules. State v. Jones, 64 Iowa 349, 17 N.W. 911, 20 N.W. 470; State v. Hessenius, 165 Iowa 415, 146 N.W. 58, L. R. A. 1915A 1078; State v. Giudice, 170 Iowa 731, 748, 153 N.W. 336, Ann. Cas. 1917C 1160; 32 C. J. S., Evidence, section 412, note 15, page 36; 22 C. J. S., Criminal Law, section 672.

In State v. Stafford, 237 Iowa 780, 23 N.W.2d 832, we discussed the res gestae rule and the elements that must exist to make the evidence admissible. We have no hesitancy here in holding the most essential element of spontaneity was present and the significance of the time element is inescapable.

■ III. In the early morning (about one o'clock) following the tragedy certain photographs were taken. Complaint is made of the admission in evidence of two of these; also of another posed picture taken several days later.

Exhibit P-7 showed the room and contents where the homicide occurred (including decedent's body) as they appeared when the photographer entered. A few minutes later Exhibit P-8 was taken after the body had been turned face down. No objection is urged here as to Exhibit P-7 but it is argued Exhibit P-8 was inadmissible because of this change in condition.

The change in the position of the body was testified to clearly and must have been understood by the jury. Defendant cites 20 Am. Jur., Evidence, section 731, in support of his contention that the changed condition made this picture inadmissible. But the rule laid down there is carefully qualified in the last sentence of the section: "* * * the only practical rule would seem to be that the changes must not be such as to destroy the substantial identity and * * * should be carefully pointed out and brought to the jury's attention." See also Coonley v. Lowden, 234 Iowa 731, 741–744, 12 N.W.2d 870; 32 C. J. S., Evidence, section 715, pages 621–623.

Exhibit P-9 was a picture of Dorothy Robertson as she appeared when the photographer came. It shows her face swollen and one eye blackened. She testified the condition of her face was due to a blow by defendant, administered immediately after the shooting while she was trying to help her wounded husband. The picture was admissible as illustrative and possibly somewhat corroborative of Dorothy's testimony.

Defendant argues it was calculated to excite passion and prejudice. That might be true to the extent the photograph is more effective than oral description. The articulate or eloquent witness has that same advantage over one less vocally endowed, but his testimony is not thereby rendered inadmissible.

It is also argued Dorothy's appearance or physical condition as revealed by the picture may have been due to the encounter with her sister earlier in the day. That argument was doubtless made to the jury where it was pertinent. Under the testimony of both defendant and Dorothy it was for the jury to determine what part of her depicted appearance was due to defendant's alleged blow and what part to the sisterly encounter earlier.

The rule as to admissibility of photographs such as Exhibit P-9 is stated in 20 Am. Jur., Evidence, section 732; 32 C. J. S.,

Evidence, section 711. See also Reddin v. Gates, 52. Iowa 210, 213, 2 N.W. 1079.

 The admission of Exhibit P-12, a posed photograph, presents a somewhat different question upon which the State frankly admits the authorities are divided. It was taken by the same photographer on July 30, two or three days after the homicide. According to his testimony it shows the same room in the Robertson home with substantially the same furniture arrangement as of the night he arrived after the tragedy. Persons are posed in the positions those present at the tragedy occupied that night as testified to by Dorothy Robertson.

Both briefs cite the annotation in 27 A. L. R.. commencing at page 913. The annotator lists the states on each side of the question. Iowa is named among those favoring admissibility of posed photographs when properly explained, citing Dice v. Johnson, 198 Iowa 1093, 199 N.W. 346. To this could now be added Coonley v. Lowden, supra.

Counting by states there is quite even division of authority. See also 32 C. J. S., Evidence, section 715 at page 624, notes 72 and 73, where a somewhat different classification of states is shown. Our court seems definitely committed to the rule of admissibility where proper foundation has been laid, and we are not disposed to reverse that position here. Exhibit P-12 was only illustrative of the testimony of the witnesses. It did not purport to be more. While its value was probably small it was admissible.

The annotation in 27 A. L. R. above-cited points out that no distinction between civil and criminal cases has been suggested in any of the decisions. It seems clear the jury here could not have been misled to defendant's disadvantage. We conclude there was no error in the admission of any of these exhibits.

IV. Coming to the question of instructions to the jury we find some seventeen divisions of defendant's brief devoted to alleged errors in giving certain instructions and refusing others that were requested. All are argued with the same earnestness and apparent belief in the magnitude and seriousness of the errors they represent.

The trial court gave thirty-three instructions in all. Defendant argues nine of them were erroneous. Eighty-one in-

structions were requested and defendant argues error in refusal of twenty-four. We give these statistics, not alone to reveal the diligence of counsel, but to illustrate the practical difficulty in appraising them to determine whether there was reversible error.

 V. Defendant complains of instructions 8 and 9 defining first- and second-degree murder and manslaughter. The first criticism is their failure to define "justifiable homicide." Under this record the only "justification" that could have been argued to the jury was self-defense. This subject was carefully and adequately explained elsewhere in the instructions. It is elementary, and the jury was clearly told the instructions must be considered as a whole and that all the applicable law would not be found in any one. See State v. Mart, 237 Iowa 181, 187, 20 N.W.2d 63.

 It is further urged the definition given of manslaughter was erroneous because the phrase "without malice" was not followed by the word "aforethought." The term "with malice aforethought, express or implied" is twice used earlier in the same instruction in defining the degrees of murder. Immediately following, the jury is told "manslaughter is the unlawful and felonious killing * * * *without malice,* express or implied." (Italics supplied.) The context makes it clear that "malice aforethought or premeditation", while necessary to be established in order to convict of murder, was not an element of manslaughter. It is not unusual to refer to "malice, express or implied" in defining manslaughter. See State v. Johnson, 215 Iowa 483, 488, 245 N.W. 728; 40 C. J. S., Homicide, section 45; State v. Norton, 227 Iowa 13 (bottom page 16), 286 N.W. 476. Moreover in instruction No. 26 the whole phrase is used in stating the conditions warranting a manslaughter verdict. There was no error.

 VI. We have examined with care the criticised instructions (Nos. 14 and 16) pertaining to defendant's purpose in going to the Robertson home that evening; those pertaining to the claim of defendant that at the time of the killing decedent was assaulting defendant; to the matter of self-defense generally (Nos. 17, 19 and 20); and those relating to the right of decedent

58

to arm and to draw his gun when assaulted by defendant's brother Walter (Nos. 21 and 22). No good purpose could be served by setting them out or by discussing the almost hypercritical argument of defendant concerning them.

It is argued, for instance, that the jury was told in effect that if defendant went to provoke a quarrel he could not avail himself of the plea of self-defense "even though he did nothing to provoke the combat" and even though Earl "was the aggressor and made the first show of force and brought on the combat." It is also urged the burden was placed on defendant to show he went there for a peaceful purpose. We cannot, and we are very sure the jury could not, read such meanings into the language of the instructions.

Nor do we find the burden was placed on defendant (as he now contends) to prove decedent was assaulting him or that the instructions would permit the jury to find the force and means used in self-defense by defendant were excessive and unjustified, even though no greater than necessary to save his life. These criticisms are based on inaccurate reading of the instructions. The jury was clearly told the burden was on the State to establish beyond a reasonable doubt that defendant did not act in self-defense.

VII. Defendant criticises instruction No. 22 which says decedent had a right to arm himself if he "feared or had reason to believe that he or anyone at his home would probably be attacked." It is urged the instruction should have embodied the fact that such fear on deceased's part must have been "founded in reason." Also, that having given instruction as to decedent's right to arm, an instruction as to defendant's right to arm should also have been given.

Defendant's requested instruction (No. 73) does not relate to defendant's *right* to arm but proposes to tell the jury that the fact he did arm would not deprive him of the right of self-defense—a quite different proposition. No request was made for an instruction as to defendant's *right* to arm, comparable to the one given as to decedent.

There was no error in refusing requested instruction No. 73. No one would contend defendant, by arming, lost the right

to defend himself from attack or to plead self-defense in an appropriate case. To so instruct would have been merely to set up a straw man to demolish.

We have some doubt of the necessity for an instruction such as No. 22, which, however, does not entirely omit the element of reasonableness. The fact that either or each party armed himself beforehand is only a circumstance bearing on prior intentions. It is not a question of the *right* to arm but of the evidentiary significance attaching to the fact that the party *did* arm. The *reasonableness* of any fear or anticipation of danger is not so important as is the *honesty* or good faith of such fear or anticipation, as bearing on the party's intention, either merely to defend or to become the aggressor. Of course the element of reasonableness would bear on the question of the reality of the alleged fear.

We are of the opinion no reversible error resulted in the giving of instruction No. 22.

VIII. The court instructed, in effect, that if an unjustifiable homicide is committed with a deadly weapon, the provocation must be great to lower the offense from murder to manslaughter; that the provocation must be such as has a natural tendency to excite the mind so that the resulting act is the product of passion rather than judgment. There is also reference to the effect of a cooling period "if there should appear to have been an interval of time between the provocation, if any, and the killing * * *."

It is argued the instruction unduly stresses the necessity for great provocation without equally emphasizing the fact that decedent also was armed. That consideration was adequately discussed in other instructions. It is also urged the reference to "cooling period" was without justification in the record. We cannot agree. But that question is moot in view of the verdict finding defendant guilty of the higher offense. See State v. Stansberry, 182 Iowa 908, 911, 166 N.W. 359; State v. Grimm, 212 Iowa 1193, 237 N.W. 451; State v. Leete, 187 Iowa 305, 308, 174 N.W. 253; State v. Evenson, 237 Iowa 1214, 1220–1222, 24 N.W.2d 762.

No other complaint is made of the instruction that use of a deadly weapon requires greater provocation to lower the offense

to manslaughter. It seems to state a logical corollary to the proposition that intent to kill or malice may be inferred from use of a deadly weapon. See State v. Brewer, 218 Iowa 1287, 1296, 1297, 254 N.W. 834; State v. Hayden, 131 Iowa 1, 8, 107 N.W. 929.

IX. Many instructions were requested and refused, e.g.: To define the word "passion" as including "anger or sudden resentment or terror or fear or fright or excitement rendering the mind incapable of cool reflection" (No. 45) ; a long and involved discussion as to "provocation" (No. 46) ; the efficacy of "good character" of the defendant, if established, as sufficient with other evidence to generate a reasonable doubt (Nos. 48 and 69) ; on the right of defendant to go to his mother's house to demand explanation from decedent and wife and to take with him a gun for self-defense only (Nos. 61 and 66) ; covering various phases of the question of self-defense (Nos. 41, 71, 74).

We think the several subjects were sufficiently covered so far as proper and that there was no error in refusing requested instructions.

X. In a motion for new trial defendant claimed one juror (who later became foreman) was guilty of misconduct in that, on the evening of the day the jury was finally selected and sworn he said in a general store at Bladensburg: "These boys Edward and Pete [referring to defendant and his brother Walter] won't ever shuck any more corn." There was some showing the statement was later repeated in a barber shop at Agency.

Affidavits were produced and some oral testimony taken in the hearing on this motion. The juror himself testified, denying the charge and stating the maker of one of the adverse affidavits afterward made some statement to him tending to impeach the affidavit.

It is argued this testimony of the juror was hearsay and the court improperly admitted and considered it. There was no such impropriety or error nor did the court abuse its discretion in overruling the motion. There was a disputed question of fact involved, and the trial court's decision upon conflicting evidence is controlling. It seems unnecessary to cite authority at this point, but see State v. Kurtz, 208 Iowa 849, 225 N.W. 847;

State v. Becker, 159 Iowa 72, 76, 140 N.W. 201; State v. Davis, 230 Iowa 309, 312, 313, 297 N.W. 274.

 XI. It is argued the court erred in refusing admission in evidence of the will of defendant's father and the court order admitting it to probate. Defendant argues the purpose of the offer was to show the ownership of the home where the tragedy took place and the mother's right of possession.

It is undisputed she was given a life estate. Dorothy testified the Robertsons were tenants. While her testimony is uncontradicted, it would of course not be conclusive if the question were important. But the Robertsons' right of occupation seems never to have been questioned, nor for that matter was any question made of the right of the other children to visit their mother. None of the family arguments, including the fight between Dorothy and Mary in the afternoon before the tragedy, seems to have involved that question. We have only Dorothy's version, as Mrs. Roop was not a witness.

The will showed nothing that was in issue or dispute. There was no error in its rejection.

 XII. It is argued defendant's motion for new trial should have been sustained because the verdict was contrary to the weight of the evidence and further because defendant did not have a fair trial. We cannot agree with these contentions.

We have avoided discussion of the family troubles that preceded the final tragedy. Doubtless, as is usual in such matters, there was blame on both sides. That defendant fired the fatal shot is unquestioned. Whether his act was justifiable self-defense or at most without malice aforethought was for the jury to determine. Defendant had a fair trial and an eminently able defense. There was no reversible error and the judgment of the district court is affirmed.—Affirmed.

All JUSTICES concur.