Argued December 15, 1970, affirmed January 14, petition for
rehearing denied February 9, petition for review
denied March 9, 1971

STATE OF OREGON, *Respondent, v.* TINA
LEE TREMBLAY, *Appellant.*

479 P2d 507

*Clifford N. Carlsen, Jr.*, Portland, argued the cause for appellant. With him on the briefs was Martin B. Vidgoff, Portland.

*Thomas H. Denney*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY, *BRANCHFIELD, and HOLMAN, Judges.

LANGTRY, J.

This appeal is from a conviction of first degree murder. ORS 163.010(1). The defendant, Tina Lee

---

* Branchfield, J., did not participate in this decision.

Tremblay, was jointly indicted with her husband, Robert Antonio Tremblay, Mark Steven Barton, and Raymond David Pister, for killing Gary Eugene DeVillez on July 16, 1969. They were tried separately.

The actors in the killing, including the victim, appear to have been members and prospective members of motorcycle gangs that had moved into the Portland-Vancouver area from California. Two days prior to the killing, decedent and others had gone to Vancouver, Washington, where Mark Barton and the Tremblays lived, and administered a severe beating to Barton. On the night of the killing, Barton and the Tremblays went to a Portland house where decedent had a room separate from several other occupants of the house. They took with them a borrowed .22 rifle. The defendant's version of the affair was that she remained in their vehicle while Barton and her husband entered the house. An altercation commenced, Barton called to her, and she brought the rifle into the house. Her husband took it as a fight between Barton and the decedent was in progress and shot the decedent. She testified that the gun was unloaded when she took it into the house and she did not have bullets for it. After decedent was shot, her husband handed the gun back to her and it accidentally discharged, wounding her husband in the foot. Barton and the Tremblays returned to Vancouver.

The details of the defendant's story are sharply contradicted by the testimony of others who were occupants of the house. For example, one testified that he first heard the commotion when the defendants pounded on the door. No one responded, "So they just walked in," without permission. He then saw three people in the kitchen, whom he positively iden-

tified as Mark Barton, Robert Tremblay (known as "Rat"), and the defendant. He said:

> "One person had a rifle * * *. I think that she had a pistol or a knife, or some sort — some sort of sidearm."

But he was not completely clear in his memory about the weapon the defendant had. He testified:

> "* * * And then, not Mark but the other — the other guy, Rat, took a couple shots through the door————."

This was the door to the decedent's room. (Barton's hat was later found in the room.) A fight ensued in the area of the hallway leading to decedent's room while the witness took two women who were living in the house, and a dog, upstairs. He testified he returned:

> "And he [Rat] came out [of the hallway leading to the victim's bedroom] and got the rifle from her. And then I heard a few more shots and by that time, I was—I was outside * * *."

He testified that he believed "Rat" carried the rifle as the three left. With reference to the defendant, he testified:

> "Well, she said something to the effect of keep your nose out of it, or it's none of your business, you keep out of it and you won't get hurt, something to that effect. I don't recall the exact words."

The police investigation turned up two empty .22 shell casings in the hallway outside decedent's room, and a similar empty shell casing at the victim's feet in the kitchen where he died. One bullet hole was found in the door of the victim's bedroom and inside his room were fragments of a bullet which had struck a box of motorcycle parts.

This defendant contends that the rifle was present only to scare the victim. Testimony of the witness related above is more than ample for the jury to have made valid inferences to the contrary. Further, the jury could conclude from cogent direct and circumstantial evidence that the three intruders first broke and entered the house, and, second, broke and entered the victim's dwelling room therein.

This defendant's husband was first tried separately and convicted of second degree murder.

The defendant assigns as error (1) that a felony-murder instruction based on burglary should not have been given; (2) receiving five photographs of the corpse; (3) that certain requested instructions of the defendant should not have been rejected; (4) that parts of the state's argument were inflammatory and prejudicial.

(1.) ORS 163.010 defines first degree murder:

"(1) Any person who purposely, and of deliberate and premeditated malice, or in the commission of or attempt to commit rape, arson, robbery or burglary, kills another, is guilty of murder in the first degree."

ORS 164.230 defines burglary:

"Any person who breaks and enters any dwelling house with intent to commit a crime therein, *or having entered with such intent, breaks any dwelling house, or is armed with a dangerous weapon therein, or assaults any person lawfully therein,* is guilty of burglary * * *." (Emphasis supplied.)

■ The court instructed the jury that if it found that the defendant or her accomplices caused the death as specified in the indictment while committing or

attempting to commit the crime of burglary in a dwelling, it was first degree murder. The court properly instructed on the elements of burglary. The defendant contends that the assault which was necessarily coupled with the breaking and entering to make up burglary merged with the ultimate killing, and that, therefore, the burglary premise cannot apply. Defendant relies upon *State v. Branch*, 244 Or 97, 415 P2d 766 (1966), in which the Oregon Supreme Court held that an attempt to predicate a second degree murder charge upon a homicide which occurred when the defendant was perpetrating an assault upon the victim could not stand.[1] Defendant quotes:

> "In order to preserve the distinctions between the degrees of murder and manslaughter, courts in other states have held that where the only felony committed (apart from the murder itself) was the assault upon the victim which resulted in the death of the victim, the assault merged with the killing and could not be relied upon by the state as an ingredient of a 'felony murder' * * *." 244 Or at 100.

In *Branch* the only other crime was the assault itself. Burglary consists of two things—one, breaking and entering a dwelling house; two, intent to commit a crime therein. The crime which a burglar usually intends to commit after he breaks into a dwelling is larceny. Defendant concedes her argument could not apply in that situation. We think her argument fails because it is obvious that the legislature intended to give added protection to persons who are within a dwelling place. This is borne out by the decision in

---

[1] ORS 163.020 provides that the killing of one by another person while the latter is committing or attempting any felony other than rape, arson, robbery or burglary is second degree murder.

*State v. Morris*, 241 Or 253, 405 P2d 369 (1965), which was decided nine months before *State v. Branch*, supra. There the facts were almost in point with those in the case at bar. The defendant went to the dwelling where the victim was living with the defendant's wife, shot through the door, gained entrance, shot and killed the victim and left. The court gave the felony-murder instruction based upon burglary consisting of a breaking and entering with intent to commit assault, just as the trial court did in the case at bar. In its decision, the court said:

"We find no error in the challenged instruction. The jury was free to believe the defendant's story if it wanted to. If, however, it chose to believe the state's witnesses, there was ample evidence that a burglary was being committed. The burglary may have been incidental to the defendant's primary purpose, which was to kill his wife and her companion, but the state was not bound to ignore the burglary. The district attorney had the right to try to prove an objective fact, burglary, in addition to a subjective one, the state of the defendant's mind.

"Burglary in this state is defined by statute. ORS 164.220 and 164.230. * * * The question is whether there was evidence from which the jury could have believed that he violated a statute which denounces certain acts and characterizes them as burglary * * *.

"It is manifest that the defendant entered the house unlawfully, that there were one or more human beings present therein, and that he intended to commit one or more crimes therein. These facts constitute burglary * * *."[20] 241 Or at 255-56.

---

[20] The merger doctrine adopted in *Branch* has also been adopted in California and New York. When the question of its

The same justice wrote the opinions in *Morris* and *Branch*. *Morris* was not cited in *Branch*. If *Branch* was intended to overrule *Morris* we assume it would have done so specifically.

ORS 163.010 (1), defining first degree murder, names rape, arson, robbery and burglary as the four felonies which are bases for a felony first degree murder count. An element of two of them, rape and robbery, is assault. If the defendant's theory with reference to the burglary in the instant case is correct, it would appear to apply equally to felony murder counts based upon rape and robbery. The legislature specifically designated these crimes as it did for a legitimate purpose. The purpose of the *Branch* decision is "to preserve the distinctions between the degrees of murder and manslaughter * * *." There is no principle of constitutional law involved. We would be invading the legislature's function if we were to extend the doctrine for reasons relating to legalistic logic.

■ Defendant contends that because her husband was convicted of second degree murder before her trial, she cannot be convicted of first degree murder.

> "The acquittal of the principal is no impediment to the trial and conviction of a person charged with aiding and abetting * * * an aider and abettor

---

extension to a felony murder situation involving burglary like that in *Morris* was presented in California, it was extended. See People v. Wilson, 1 Cal3d 431, 82 Cal Rptr 494, 462 P2d 22 (1970), and People v. Sears, 2 Cal3d 180, 84 Cal Rptr 711, 465 P2d 847 (1970). In the latter case, it was noted that New York had refused to extend the rule in People v. Moran, 246 NY 100, 158 NE 35 (1927), and People v. Wagner, 245 NY 143, 156 NE 644 (1927). See also, People v. Luscomb, 292 NY 390, 55 NE2d 469, 472-75 (1944). Whatever the holding may be in other states, our decision depends upon our own statute and the decision in *Morris*.

may be convicted of a felony although the principal has been convicted of a mere misdemeanor * * *." 21 Am Jur 2d 201, Criminal Law § 128.

■ The theory of collateral estoppel is available in criminal cases. *State v. George*, 253 Or 458, 455 P2d 609 (1969), and *State of Oregon v. Dewey*, 206 Or 496, 292 P2d 799 (1956). It avails defendant nothing in this case. See the first point of the decision in *George*.

Moreover, some of the jointly-indicted defendants chose to demand separate trials under Oregon's unique statute which allows the same as a matter of right. ORS 136.060. A chance that defendants take when this statutory right is demanded is that the evidence will be stronger in one trial than another, and that different juries will draw varying inferences and conclusions from the same conflicting evidence.

■ Defendant complains that the indictment did not warn her of the state's felony-murder theory; therefore, it was error to submit it to the jury. *State v. Earp*, 250 Or 19, 440 P2d 214, *cert denied* 393 US 891, 89 S Ct 212, 21 L Ed 2d 170 (1968), and *State v. Reyes*, 209 Or 595, 303 P2d 519, 304 P2d 446, 308 P2d 182 (1957), reject this contention:

> "* * * [A]n indictment which charges only premeditated murder is sufficient to sustain a conviction of murder in the first degree where the proof discloses that the killing was done in the course of * * * a felony." 250 Or at 27.

■ (2.) Five photographs of the victim's corpse were received in evidence. Defendant contends that they were prejudicial and calculated to inflame the jury. Defendant's counsel made no objection when some such photographs were offered; objected to five that were offered on grounds they were cumulative, and for

that reason the court rejected three of them; and objected to two because "They are cumulative, calculated to inflame————." The witness, a physician, testified the latter two would assist in his testimony, and they were received.

The court properly exercised its discretion. *State v. Freeman*, 232 Or 267, 374 P2d 453 (1962), *cert denied* 373 US 919, 83 S Ct 1310, 10 L Ed 2d 418 (1963).

■ (3.) Defendant claims error because of failure of the court to give instructions defendant submitted concerning the responsibility of defendant for the actions of her codefendants. The court gave Oregon State Bar Uniform Jury Instruction No. 225.01, which adequately and completely instructs the jury on this subject.

■ (4.) Defendant argues that some of the prosecutor's remarks in his argument to the jury were inflammatory and prejudicial. Defendant made no objection at the time. Ordinarily, we will not take cognizance of alleged error in such a state of the record. See our discussion in *State v. Brown*, 4 Or App 219, 475 P2d 973 (1970).

The essence of the remarks to which defendant objects are, in the prosecutor's words:

"* * * These defendants came here from * * * California and * * * brought with them * * * goon squads, beatings, retaliation and revenge * * *.

"And killings are a new element interjected into the motorcycle club subculture * * * and they are all watching to see what * * * our community * * * [will do].

"* * * * *

"If motorcycle clubbers like this defendant and her husband think that they have absolute immunity to break, plunder, steal, kill, assault; we are going to be in a big mess, ladies and gentlemen. We'll be winding up with nothing but anarchy."

We find nothing in these remarks to cause us to waive the rule requiring proper objection or exception.

Affirmed.