STATE of Iowa, Appellee,

v.

Elbert James HINKLE, Appellant.

No. 56309.

Supreme Court of Iowa.

May 21, 1975.

Holmes, Ralph & Kutmus, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Jim P. Robbins, Asst. Atty. Gen., and Ray Fenton, County Atty., for appellee.

Heard by MOORE, C. J., and LeGRAND, REES, REYNOLDSON and HARRIS, JJ.

REYNOLDSON, Justice.

Defendant was indicted for first degree murder, a violation of § 690.2, The Code. Following trial and conviction, judgment was entered sentencing him to life imprisonment. Upon defendant's appeal, we affirm.

From the record before us the jury could have found the following facts.

The homicide victim, Patty Bradley, and her husband, Abraham, lived at 1358 Idaho Street, Des Moines, Iowa. Patty and Abraham were separated for two or three months, during which time defendant Hinkle was staying at the Idaho street home. Apparently there was a reconciliation. Abraham went to the house when he left his work shortly before midnight on October 5, 1972. He attempted to persuade Hinkle to return the keys to the house and to Patty's car.

When Hinkle left to get the keys Abraham, frightened, armed himself with a short-barrelled, eight-shot .22 caliber re-

volver kept under a mattress in the house. He loaded it with the only shells he had, three .22 caliber "long" cartridges. After Hinkle returned with the keys Abraham transported him and his "luggage" to a Hutton street address. When Abraham returned to 1358 Idaho he placed the gun back under the mattress.

The next morning, October 6, Abraham drove Patty to her employment, delivered their two children to a day-care center, then transacted business downtown. When he returned home he discovered someone had broken a window latch, entered the home and had taken groceries and some of Patty's clothing. He did not then determine the gun was missing. A window in Patty's auto was broken, some gas had been removed, and motor wiring pulled loose.

Until Abraham left home at 3:15 P.M. to go to his employment he was busy installing new window and door locks.

At about 4:15 P.M. Abraham received a call from Patty. He was permitted to testify, over objections to be later discussed, that he told her he did not think Hinkle would kill her and to take a cab home from work instead of the bus. When Abraham went home for supper he finished installing the window locks and returned to work.

At about 8:10 P.M. a neighbor lady, Patricia Cason, started toward the Bradley home for a visit, then recognized defendant's voice coming from the porch. She retreated to an adjoining house occupied by Judy Parrish. Patricia Cason and Judy heard glass breaking and Patty Bradley screaming. Patricia ran to her own home to call the police. Judy saw a person breaking out the front door glass with a chair, then standing inside the home with his arm raised. She heard shots while she was engaged in protective measures for her own children.

The police responded within minutes. Patty Bradley was found dead on the front room floor, lying on her back in a pool of blood. She had been shot seven times. One bullet had pierced the top of her pant-suit before it entered her abdomen, but subsequently this top had been pulled up to chest level. Her legs and thighs were spread and her slacks and panties were pulled down around her right ankle.

Defendant Hinkle was found crouching in a small room in the basement. Responding to an inquiry from the officer who found him, he said "This is where I keep my stash." Only items ordinarily found in a basement were in this room. Defendant had on his person the same eight-shot .22 caliber revolver left under the mattress by Abraham early that morning. It contained seven spent cartridges. Defendant also carried a new, partially-filled box of .22 caliber "short" cartridges and a butcher knife. His clothing and shoes were blood stained. Human blood samples taken from his trousers and the fly area of his undershorts were the same type blood as that of the victim.

At a later police-station interrogation defendant admitted he had obtained the gun earlier in the day. That evening, according to defendant, he had been drinking and went to return dresses to Patty Bradley. She told him, through the door, to leave them on the porch. He then took a porch chair and broke the glass out of the door and went in. Patty was sitting on the couch and he went to the basement for a drink. He denied killing her. The dresses referred to by defendant were never found.

Tests of defendant's right hand revealed minute traces of lead which may result from firing a gun. A witness from the Bureau of Criminal Investigation laboratory testified that in his opinion, based on certain tests and microscopic inspections, one of the less damaged bullets removed from the victim's body had been fired from the revolver taken from defendant.

The only evidence offered by defendant was testimony from two witnesses relating to his claimed intoxication on the evening of October 6, a condition controverted by law officers who arrested him.

Two of the propositions defendant relies on for reversal relate to admission of testimony, the remaining two are directed to claimed erroneous instructions.

I. Defendant formulates his first question presented by this appeal as follows:

"Did the court err in allowing into evidence the hearsay testimonies of the deceased's husband, neighbor and a police officer relative to threats made to deceased by appellant?"

Defendant argues,

"[T]he testimony at the trial did not come from a witness to the threat; the witness to the threat is dead. The testimony came from persons to whom the deceased had related the alleged threat. It is thus hearsay upon hearsay. In other words, if the threats had been heard by the neighbor, the husband, or the policeman, the court would have been perfectly justified in allowing their admission."

Examining the issue as thus formulated and argued, it is apparent defendant overlooks a formidable array of Iowa decisions which have held admissible, as part of the "res gestae," statements made by a homicide victim before the assault. State v. Ebelsheiser, 242 Iowa 49, 54, 43 N.W.2d 706, 710 (1950); State v. Giudice, 170 Iowa 731, 748–749, 153 N.W. 336, 342 (1915); State v. Hessenius, 165 Iowa 415, 431, 146 N.W. 58, 65 (1914); State v. Jones, 64 Iowa 349, 353, 17 N.W. 911, 912 (1884). Further ignored in defendant's arguments are decisions and authorities from Iowa and elsewhere which hold threats made by the accused to the victim, or the victim's fear of the accused, communicated by the victim to a third person, may be testified to by the third person, particularly where (as here) the killer's identity is in issue. State v. Ebelsheiser, supra; State v. Gause, 107 Ariz. 491, 495, 489 P.2d 830, 834 (1971), vacated on other grounds, 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972); People v. Merkouris, 52 Cal.2d 672, 682, 344 P.2d 1, 6 (1959), cert. denied, 361 U.S. 943, 80 S.Ct. 411, 4 L.Ed.2d 364 (1960); Lowrey v. State, 87 Okl.Cr. 313, 339, 197 P.2d 637, 651 (1948); State v. Bauers, 25 Wash.2d 825, 838–839, 172 P.2d 279, 286–287 (1946); 40 Am.Jur.2d, Homicide § 334, p. 603; 3 Underhill's Criminal Evidence (Herrick 5 Ed. 1957) § 650 (1970 Pocket Part, p. 49); cf. People v. Hamilton, 55 Cal.2d 881, 362 P.2d 473 (1961); but see United States v. Brown, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973) (employing an admissibility test weighing relevance vis-a-vis prejudicial effect).

But in the trial of this case the prosecution, apparently also disregarding the above rule, proceeded to prove the threats indirectly by introduction of testimony of what the witness said concerning defendant's threats communicated by the victim. In view of the overwhelming evidence of defendant's guilt, the State's convoluted and risky efforts in this regard were a classic example of evidentiary over-kill.

In overruling hearsay objections to questions seeking to elicit what the witness said on a prior occasion, trial court stated on the record the reason for the hearsay rule is that the person who makes the statement is not available for cross-examination and, as long as the question merely sought what the witness said, it was not hearsay. This pragmatic approach finds support in the notes of the advisory committee on the proposed federal rules (see 28 U.S.C.A. at 528–529); the Model Code of Evidence (American Law Institute, Model Code of Evidence, 1942, rule 503[b], pp. 231–234); the Uniform Rules of Evidence (Handbook of the National Conference of Commissioners on Uniform State Laws, 1953, rule 63[1], pp. 197–198); McCormick on Evidence (2 Ed.1972) § 251, pp. 601–604; and 3A Wigmore, Evidence (Chadbourn rev. 1970) § 1018, p. 996.

The transcript indicates the State may have persuaded the trial judge that in State v. Smith, 195 N.W.2d 673, 675–676 (Iowa 1972) we departed from the orthodox or traditional view that a prior statement of a witness is hearsay if offered to prove the happenings of the matter asserted therein. In *Smith* we quoted from the hearsay-

defining portion of rule 801, proposed federal rules of evidence. We did not then, nor have we yet, adopted the balance of the proposed rule or the rule in its final form, 28 U.S.C.A. Rule 801, p. 525, although neither standing alone would support the admission of the testimony in controversy here.

With this backdrop we turn to the specific complaints made by defendant, limited by the issue as he has formulated it. We observe that the several events which climaxed in the death of Patty Bradley on the evening of October 6 commenced early on that same morning with the ejection of defendant from the Bradley home and thereafter motivated the movements and reactions of the involved parties. We further note our rule there is no reversible error if trial court's ruling which admitted the evidence in controversy may be sustained on any ground. See Dealers Warehouse Co. v. Wahl & Associates, 216 N.W.2d 391, 394 (Iowa 1974).

■ Abraham testified Patty telephoned at about 4:15 P.M., October 6, concerning a telephone call she had received.

The following record was then made:

"Q. (By Mr. Hansen) And after you had the conversation with her, and as a result of that conversation, what did you say to her? A. I told her that I didn't think that the defendant, Hinkle, would kill her.

MR. HOLMES: Just a minute. I'm going to object to that, and I want to make a standing objection to this testimony. It is an attempt by the County to circumvent the hearsay rule and try to get in some testimony."

The belated objection interposed by defendant was clearly inadequate:

"No motion to strike was made. No application was made to have the objection precede any answers. No excuse was offered for tardiness in objecting. No claim of error was preserved."

—State v. Hendren, 216 N.W.2d 302, 305 (Iowa 1974) and citations.

■ The second incident involved the testimony of the Bradleys' next-door neighbor, Judy Parrish. She was permitted to testify concerning a statement to another neighbor, Patricia Cason, just before the murder. She related Patty Bradley had told her earlier—apparently about 6 or 7 P.M.—that defendant "had come in earlier in the day and took some things out of the house and that she had gotten a call that day and that she was afraid, and that was the reason Brad was changing the locks on the door." Trial court overruled defendant's hearsay objection with the cautionary statement it was not offered for the truth of what was said, but for the fact it was said.

It is obvious from the record that this report by one in the vortex of a fear-ridden neighborhood immediately prior to the homicide caused Judy Parrish to approach the Bradley home and return at once in great excitement just before she heard the Bradley door being broken down.

Trial court might have admitted direct testimony of Judy Parrish relating to Patty Bradley's statement concerning defendant's threats and the victim's fear of defendant, under the rule most recently articulated in State v. Lyons, 210 N.W.2d 543, 546–547 (Iowa 1973). These facts may be admissible as necessary to complete the story of the crime on trial, the acts being so closely related in point of time and place and so intimately associated with each other they form a part of the whole transaction.

Such evidence is posited more solidly on this rule than the "res gestae" ground which has been frequently relied on in our decisions. See State v. Ebelsheiser, supra, 242 Iowa at 54, 43 N.W.2d at 710 (witnesses permitted to testify victim told them some hours before the attack he was afraid to go into the house where defendant was); State v. Giudice, supra, 170 Iowa at 748–749, 153 N.W.2d at 342 (witness permitted to testify that victim told him before attack he wanted "to go out Avenue I" and "he wanted to try to get a full month this month"); State

v. Hessenius, supra, 165 Iowa at 431, 146 N.W. at 65 (witness permitted to testify victim told her on the telephone, concerning a plan for attendance at church function, that she doubted her husband would be willing to get his own dinner); State v. Jones, supra, 64 Iowa at 352–353, 17 N.W. at 912 (testimony admitted that victim made arrangement night before murder to go to a named place to look at cattle).

In any event, we believe the statement in issue was admissible, for the purpose of showing it was said, under the *Lyons* rule, in explaining the actions of these witnesses.

■ The final incident relied on by defendant to support this issue relates to statements made by Abraham to Officer Brewer.

Brewer testified, on cross-examination, that when Mr. Bradley arrived he was not permitted to enter the house but was placed in the patrol car. He was then asked "Didn't he make the statement that Mr. Hinkle had been going with his wife?" The witness replied "Yes, he did." Upon redirect the State then asked, "Did he also make the statement that Patty Bradley had received a telephone call and been threatened by Mr. Hinkle?" Brewer responded, "Yes, when I talked to Mr. Bradley later."

Upon recross-examination it was developed the last statement was made after Abraham was removed from the patrol car and taken into a neighboring home. Defendant then moved to strike the testimony developed on redirect examination on the ground it was hearsay and not part of the res gestae. This motion was overruled.

Brewer's recollection there was a break in his conversation with Abraham does not square with the latter's testimony that when he left the police car he returned to his place of employment to tell his employer he would not be at work for a time. If Abraham was correct, then there was no break in the conversation with Brewer and, as one portion was developed by defendant on cross-examination, the balance of the same conversation was admissible on redirect. Section 622.19, The Code.

■ But the redirect testimony was also admissible on another ground. The only apparent reason for inquiring into Abraham's statement to Brewer that defendant had been going with his wife was to show a friendly relationship between defendant and the homicide victim. Brewer's testimony was subject to a hearsay objection which was not made. Nonetheless, the impression left with the jury was obviously unbalanced. The court in all fairness properly exercised its discretion to allow the State to offer responsive but otherwise inadmissible evidence on the same subject, under the doctrine of curative admissibility. Vine Street Corporation v. City of Council Bluffs, 220 N.W.2d 860, 864 (Iowa 1974) and citations.

We find defendant's first proposition relied on for reversal to be without merit.

■ II. Defendant contends trial court erroneously overruled his motion to strike the testimony of Dr. Wooters, deputy medical examiner for Polk county, relating to his "strong suspicion" the decedent had been raped.

Dr. Wooters arrived at the Bradley home within an hour after Patty Bradley was shot and there first examined her body. Testifying, he described to the jury the position of the body and the clothing, then stated without objection, "This suggested to me that she had possibly had sexual molestation or might have been raped * * *."

Following this the State asked, "Based on what you observed at the scene, do you have an opinion as to whether or not penetration was made?" Defendant objected. The question was withdrawn and never answered.

On cross-examination Dr. Wooters testified to his "strong suspicion" of rape based upon the "gross evidence" (position of legs and clothing). This testimony was responsive to defendant's own questions.

As the doctor left the stand defendant moved to strike the rape testimony because "It was merely his opinion based on a suggestion. It was not based on medical certainty * * *." Subsequently defendant moved for mistrial grounded in part upon Dr. Wooters' testimony, alleging it was "not in the realm of expert testimony, that no foundation was laid to show that the doctor was an expert in this particular matter." These motions were overruled.

Assuming arguendo proper objection had been timely made, defendant complains of a self-inflicted wound:

"[A] party to a criminal proceeding will not be permitted to complain of error with respect to the admission or exclusion of evidence where * * * he himself has acquiesced in, committed, or invited the error."

—24A C.J.S. Criminal Law § 1843, p. 588. See State v. King, 225 N.W.2d 337, 341 (Iowa 1975); State v. Sage, 162 N.W.2d 502, 504 (Iowa 1968); State v. Leitzke, 206 Iowa 365, 370, 218 N.W. 936, 938 (1928).

This self-induced error, if error at all, cannot be asserted by defendant.

III. Defendant posits error in trial court's various instructions relating to first degree murder under the felony-murder rule of § 690.2, The Code. Basically, he complains there was insufficient evidence to warrant instructions relating to rape and burglary.

■ The rape instruction was fully justified by the evidence related above, including the position of decedent's body, her disarrayed clothing, and the blood on defendant's trousers and the fly area of his undershorts when he was apprehended fully dressed.

■ Turning to the burglary instruction, trial court properly instructed the jury the elements of burglary are 1) the breaking and entering of a dwelling, 2) in the nighttime, 3) with the intent to commit a public offense. See § 708.1, The Code.

Concentrating on the last element, defendant now raises the "felony merger" principle, claiming the only public offense intended was murder or a lesser included offense thereof. He relies on cases from jurisdictions which hold application of the felony-murder doctrine is limited by the principle of merger, so that it does not apply where the underlying felony merges in and with the homicide, especially where the felony involved is some form of felonious assault on the person killed. See Annot., 40 A.L.R.3d 1341, 1343.

We have serious doubt defendant presented this issue to trial court. After making clear all of his objections were concerned with the evidentiary bases for the rape and burglary instructions defendant stated:

"Object to Instruction No. 9 for the same reason. It sets forth that malice aforethought may be inferred from the attempted commission of rape or *assault with a deadly weapon. It is the rape part that I object to*." (Emphasis supplied.)

Neither by objection nor requested instruction did defendant seek to limit "public offense" to offenses not included in murder.

Other jurisdictions confronted with a properly-presented "felony merger" issue have demonstrated a reluctance to allow the State to bootstrap a higher degree of murder solely on the basis of a felonious assault—thus inevitably reading out the element of malice aforethought or premeditation. See Annot., 40 A.L.R.3d 1341. Among courts considering the doctrine it has gained widespread acceptance. However, when courts have considered it in the context of a felonious assault constituting a public offense under a burglary felony-murder instruction disagreement has arisen. California has steadfastly held when the public offense upon which burglary is based is assault with a deadly weapon, a merger results under a type of "lesser-included-in-fact" analysis. People v. Sears, 2 Cal.3d 180, 84 Cal.Rptr. 711, 465 P.2d 847 (1970);

People v. Wilson, 1 Cal.3d 431, 82 Cal.Rptr. 494, 462 P.2d 22 (1969); see People v. Burton, 6 Cal.3d 375, 99 Cal.Rptr. 1, 491 P.2d 793 (1971). Other courts have held there was no merger when the assault was an element of a burglary. See, e. g., State v. Miller, 110 Ariz. 489, 520 P.2d 1113 (1974); State v. Tremblay, 4 Or.App. 512, 479 P.2d 507 (1971); State v. Morris, 241 Or. 253, 405 P.2d 369 (1965). In *Tremblay* the court reasoned the legislature intended, by including burglary in the felony-murder statute, to afford greater protection to people in their dwelling places. 4 Or.App. at 517, 479 P.2d at 510. The *Miller* court, recognizing the merger doctrine, held it applied only when the assault *alone* is the basis of the felony-murder instruction. 110 Ariz. at 490, 520 P.2d at 1114.

As above noted, defendant makes the unwarranted assumption the evidence only demonstrated his intent to shoot the deceased, not to commit another offense. We are not so persuaded.

■ "Public offense" within the burglary statute encompasses "a wide variety of specific crimes to which the state attaches a penalty for the infraction thereof." State v. McClelland, 164 N.W.2d 189, 197 (Iowa 1969). The "public offense" is not limited to larceny. See State v. Farrand, 192 Iowa 809, 185 N.W. 586 (1921) (assault); State v. Hall, 168 Iowa 221, 150 N.W. 97 (1914) (adultery).

■ In the case before us, there was sufficient evidence to permit the jury to find defendant broke and entered in the nighttime with intent to commit rape, and therefore committed a burglary. It is this intent which is crucial, not, as defendant seems to argue, whether a rape (or attempt) was committed before or after the shots were fired. Failure to complete the intended public offense does not negate burglary as the statute requires only intent. Section 708.1, The Code; see State v. Allnutt, 158 N.W.2d 715, 716 (Iowa 1968).

■ Trial court correctly submitted both burglary and rape under the felony-murder rule.

■ IV. In his final assignment defendant asserts trial court erred by instructing the jury defendant had the burden of proving he was intoxicated at the time of the offense. This issue was not properly presented below and will not be considered on appeal.

■ While we doubt this issue was timely raised we need not base our decision on that ground. The record shows the most specific objection made merely reiterated the instruction:

"3) That the Court materially misdirected the jury as follows:

"(a) By instructing the jury that the burden of proof was on the Defendant to prove that he was intoxicated at the time of the alleged offense."

In State v. Buchanan, 207 N.W.2d 784, 787 (Iowa 1973) (decided subsequent to this trial) we considered an objection to a similar instruction:

"With respect to the instruction in question, defense counsel pointed out the part dealing with the burden of proof and made this objection: 'We believe that is no longer the law.' This is tantamount to saying that the instruction does not state the law, which is insufficiently specific to constitute a basis for error."

In the case *sub judice* no more was accomplished by pointing out the instruction and telling trial court it "materially misdirected the jury."

We find no reversible error. Upon the whole record, defendant was accorded a fair trial.

Affirmed.