# IN THE COURT OF APPEALS OF IOWA

No. 13-1095
Filed November 13, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TYLER JAMES WEBSTER,**
        Defendant-Appellant.
_____


        Appeal from the Iowa District Court for Jefferson County, Myron L. Gookin,

Judge.


        Tyler Webster appeals from the judgment and conviction entered following

a jury trial and a guilty verdict on the charge of second-degree murder.

**REVERSED AND REMANDED FOR A NEW TRIAL.**



        Mark C. Smith, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Heather Ann Mapes and Kevin

Cmelik, Assistant Attorneys General, Timothy W. Dille, County Attorney, and

Denise A. Timmins, Assistant County Attorney, for appellee.



        Heard by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**DOYLE, J.**

Tyler Webster appeals from the judgment and conviction entered following a jury trial and a guilty verdict on the charge of second-degree murder. We reverse and remand for a new trial.

### I. Background Facts and Proceedings.

Tyler Webster and Buddy Frisbie had been good friends since their teenage years. On the evening of August 25, 2012, Frisbie and his girlfriend, Shelby Hall, went to a friend's house. There, they met Webster and Knight, a mutual friend of Frisbie's and Webster's. After a few hours of partying, Frisbie and Hall decided to go fishing and invited Webster to go along.

Frisbie and Hall drove back to their camper-trailer, located on Knight's property, to get their things. Webster and Knight also drove back to the campers in Webster's truck. It started raining, so Frisbie and Hall went into their trailer, and Webster went in with them. Knight returned to his own trailer.

At some point, Webster believed Frisbie was trying to force himself upon Hall. Webster left the trailer, went outside to his truck, and got a pistol out of the glove box. When he returned to the trailer and opened the door, Frisbie and Hall were kissing. Webster shot Frisbie twice in the head. Hall got up and ran to Knight's trailer.

Hall told Knight what happened, and he told her to hide in the back of his trailer. Knight grabbed his shotgun and stood at his door, and Webster came walking over with the gun still in his hand. Knight told Webster to put his gun down or he would shoot. Webster put the gun down and Knight called 9-1-1. Knight and Webster then walked up to the end of the road and waited for law

enforcement to arrive. Webster was arrested thereafter. Frisbie died of the gunshot wounds, and Webster was subsequently charged with first-degree murder.

After voir dire and jury selection, which was not reported, the jury was impaneled and trial commenced. Throughout the one-week trial, the court admonished the jurors not to talk between themselves or to anyone else about the case and not to read or listen to any news reports. The court also admonished the jurors to keep an open mind and not reach any conclusions until the case was completed.

After the defense rested, a record was made outside the presence of the jury concerning an issue that had arisen concerning one juror. The court explained:

> [A]t this point I wanted to bring up to counsel—I had mentioned this off the record previously—that on [the afternoon of Thursday, April 11], after we completed testimony . . . , I was approached by the clerk of court and the court attendant who indicated that they had received some information that one of our jurors, ["Juror"], who works here in the courthouse, had, previous to the trial beginning, mentioned to both the [clerk] as well as one of [the clerk's] assistants . . . that she would probably never be picked for the jury in this case because she knew the family.
>   Once the trial began and the clerk saw who was on the jury and noticed that [Juror] was on the jury, that surprised her and in passing on Thursday afternoon, [the clerk] mentioned to our court attendant . . . that she was really surprised to see [Juror] on the jury since she'd indicated that she knew the family.
>   [The court attendant] was concerned in that she didn't recall as a part of the jury selection process that she'd sat through that [Juror] had said anything about having any connection to either side of the family, whether it was Mr. Webster or [Frisbie], and so they brought that to my attention. And I in turn indicated to the attorneys that that had happened, and it's my understanding that in order to maybe flesh this out a little bit more that the attorneys may want to ask some additional questions of [Juror] concerning her qualifications as a juror.

Defense counsel then questioned Juror. Juror said she is a Facebook[1] user, and Frisbie's parents, as well as one of Webster's wife's relatives, were "on [her] Facebook." Juror testified she had not spoken "to anyone." Juror also said her daughter, then twenty-seven-years old, had gone to school with and was friends with Frisbie's sibling. Juror said she did not know Frisbie himself, but she knew his parents in passing. She said that on the night of the incident, her Facebook news feed[2] "was going like clockwork," and a friend of hers was posting "just anything she heard" concerning the shooting. When asked if she "would decide the case based upon what [she] remember[ed] from Facebook that night," Juror answered:

> I did not hear enough of Facebook except for that there had been a shooting, somebody had died. No. Absolutely—the Facebook meant nothing, and only that the next day my daughter told me who it was because, you know, I was trying to place who it was. But nothing—there would be nothing decided on any of those conversations there.

She said she had not talked to her daughter about the shooting "other than her [daughter] telling [her] who it was and that it was [Frisbie's sibling] . . . , that's all [her daughter] ever told [her] about it because [her daughter and Frisbie's sibling] were—are friends." She said it would not be difficult for her to be fair and impartial with the type of relationship she had with Frisbie's parents. Additionally, she stated:

---

[1] For a full Facebook terminology primer, see Facebook's Glossary of Terms, available at http://www.facebook.com/help/219443701509174 (last visited 8/13/2014).

[2] Facebook's Glossary of Terms explains: "Your News Feed is an ongoing list of updates on your homepage that shows you what's new with the friends and Pages you follow." http://www.facebook.com/help/128162313943092 (last visited 8/13/2014). Facebook friends "are people you connect and share with on Facebook." https://www.facebook.com/help/255089167852519 (last visited 8/13/2014).

I'm not biased towards anyone. I don't think, you know, the proceedings are spelling out, and when it comes time, I think I can make a fully good decision based on everything that I've written in my notes—

. . . .

—several pages that I've—yeah, nothing I've wrote anywhere else. All of it's been wrote in the courtroom of course. That's all we can. Everything, you know, I think I can, you know, I think I've taken good notes, and I think I'll make a good decision based solely on what's in my notes.

Webster's attorney "pass[ed] for cause" and did not request Juror be removed from the jury panel.

The next morning, counsel completed their closing arguments. After reading the jury its instructions, the court recessed the two alternate jurors. The matter was submitted to the jury, and approximately five hours later, the jury returned a verdict finding Webster guilty of murder in the second degree, in violation of Iowa Code sections 707.1 and 707.3 (2011).

Webster subsequently filed motions for a new trial and in arrest of judgment. Webster submitted that new evidence came to light concerning Juror's actions during and after the trial, and he asserted Juror's conduct amounted to juror misconduct, by which he was denied a fair trial. The State resisted Webster's motions.

A hearing on the motions was held, and three witnesses were called to testify about Juror's alleged statements and actions. The first witness was an employee at a convenience store who testified she had known Juror for a long time, though she was "[n]ot real close friends with her." The store employee testified that during the week of the trial, Juror had stopped in the store to make a purchase, and Juror had a conversation with two other customers Juror

"evidently knew." The store employee testified the conversation was "basically about the trial. [The employee] did not know [Juror] was a juror at that time. But then when [Juror] was talking to them back and forth, . . . [the employee] concluded that [Juror] was a juror." The employee testified one of the customers stated, "Everyone knows he's guilty," and Juror responded, "Yeah." The store employee testified the employee asked Juror, when Juror was paying for her purchase, if she was on the jury, and Juror told the employee she was. Responding to another question posed by the employee, the employee testified Juror told her Webster had "pled not guilty, . . . and [the jury had] to decide guilt or innocence."

The second witness testified she knew "Webster's mother and had followed all along . . . the facts as understood by his mother in the trial." Webster's mother was the witness's housekeeper, and considered a friend by the witness. The witness testified that a few days after the trial, she saw Juror in the grocery store, and Juror "was loudly proclaiming about the trial and the results of the trial and how just they were, and that he was guilty, and he deserved what he got and whatever." She testified she stopped Juror, and she and Juror discussed the verdict. The witness testified the Juror stated Webster could have gotten help from Knight because, contrary to Webster's testimony, he was not an old man and she "looked up his age." The witness also testified that Juror told her, "[M]y daughter . . . knew both [Webster and Frisbie] when they were young, and that [Frisbie] was just this kind, sweet, gentle, polite person" and Webster "was a mouthy, aggressive . . . verbally—you know, aggressive person." She also testified Juror told her, "I know the Frisbie family, and those are good people.

I . . . didn't know [Frisbie], but I know the family, and they're good people." The witness testified she asked Juror why she did not recuse herself like another potential juror "did when he got up and said, 'I know the Webster family and I know the Frisbie family, and therefore I shouldn't be on the jury.'" She testified Juror responded, "They didn't ask me, so I didn't tell them." The witness questioned Juror, "They didn't ask any of the jurors if anyone knew the Frisbie family?" The witness testified Juror said, "'Nope,' and she smiled and felt very proud of herself that she'd dodged that one."

The third witness was Webster's wife, who testified she had heard from a number of people "that there was a particular juror that was discussing things and who had actually said . . . that she knew the Frisbie family, but they never asked her directly, so . . . she didn't say anything." Webster's wife testified she looked at Juror's comments and activity on Facebook, and Webster's wife printed the pages she found where Juror had commented or "Like[d]" a post posted on Facebook by Frisbie's mother.[3] The printed pages were offered and admitted into evidence.

The exhibit shows that Juror had, as of May 17, 2013, 930 Facebook "friends." About a month before trial commenced, on or about Juror's birthday, Frisbie's mother wrote on Juror's timeline, "Have a wonderful day." During trial, on April 11, 2013, Frisbie's mother posted on her own Facebook wall, "Give me strength," and at some point Juror's daughter "Like[d]" the comment.

---

[3] Facebook's Glossary of Terms provides: "Clicking **Like** is a way to give positive feedback and connect with things you care about." *See* http://www.facebook.com/help/246923661994614 (last visited 8/13/2014).

On April 16, after the jury rendered its verdict, Juror posted the following status update on her Facebook wall:

> So I have been kind of quiet about this because I couldn't really talk about it—and especially on here.  Several people knew that I have been on jury duty.  I was one of 12 jurors for the murder trial that ended this evening with the ruling of guilty of 2d degree murder.  I have never been a juror and never seen an actual trial.  I did not realize what it entailed until this last week.  It was the hardest decision to come up with because there are 12 people that could possibly here [sic] several different things or take several things differently.  There are no winners in this. . . .  [P]eople are still hurting because of this but I feel that justice had to prevail and the system worked.  It may or may not have came [sic] out exactly how all of us wanted but there is punishment being made and also he still has to answer to the highest power—God!

Frisbie's mother also posted a status on her Facebook wall after the verdict was rendered: "Verdict back murder 2.  Wanting murder 1 but will take it.  We can now move forward as best we can.  I do feel for [Webster's] family . . . ."  Juror commented on Frisbie's mother's status that night: "I wish you could have gotten murder in 1st degree.  I can safely say that this was a very hard decision.  I could talk to you more about it if you wanted at some point—just message me."

Juror also testified at the hearing.  She testified she was friends with Frisbie's mother on Facebook.  She also testified she was friends with Frisbie's sibling on Facebook, who was "very good friend[]" of her daughter's.  She testified that during the jury deliberation,

> there was a comment made . . . that we'd loved to have been able to talk to [Knight] or heard [Knight]. . . .  [S]omebody [said], "Well, this is what was stated about [Knight]; that he was old."  So I decided—like I said, I did not . . . feel good about sending somebody to prison. . . .  I looked it up on the morning after the . . . trial, I looked it up and found out he's my age.

She admitted she used the computer of her employer, the Iowa Department of Transportation, to look up Knight's age, but she testified it was after the jury trial. She testified she was basically just friends in passing with the Frisbie family, and though she was not close to the family, she knew it was a good family because her daughter said they were a good family and her "daughter would never allow her [own] daughter to go with the Frisbie family or for the Frisbie family to babysit [her] granddaughter if [her] daughter didn't feel that way." Juror testified she had commented she could not believe she was selected for the jury panel because she "[knew] the Frisbie family, [her] daughter is friends with the Frisbie family." She further testified, "I'm not close friends. I don't know if you could say I have a total close friend." Finally, Juror testified she also "Like[d]" Frisbie's mother's "Give me strength" comment "probably" during trial, but denied she "communicated" with the victim's mother, testifying she merely "clicked a button that said '[L]ike.'"

With regard to the convenience store incident that occurred during the trial, Juror testified she tried to avoid the conversation. When someone in the store made a comment to her about the trial, Juror testified, "I said, trying to— without saying anything, was, 'Yeah, I just wish it'd be over,' rolled my eyes, completely wanted to get out of there." Juror testified that as she was writing out a check to pay for her pizza, the store clerk said something to her and Juror responded she was a juror. The clerk asked what was being done and Juror responded, "He pled not guilty. You have to prove guilt or innocence."

With regard to the grocery store incident that occurred after the trial was over, Juror testified she had a conversation with another lady who had been in

the jury pool. Juror testified she told the lady she thought a relationship with the Frisbie family would keep her off the jury, but she was not asked. She testified, "I didn't know how to tell. I guess I'm dumb to the rules." She told the lady it did come out when she had the in-chambers meeting during trial. Juror was then approached by the woman who employed Webster's mother as a housekeeper. Juror testified she was intimidated when the woman came at her and said, "You put an innocent man in jail." Juror testified the conversation lasted a few minutes. Later she went back to talk with the woman. Juror testified she told the woman, "Who do you believe? You say [Webster is] a good man. The Frisbies are good people. Who do you believe? You go with the evidence that is in front of you, and you go with that. That's what you have to go with."

The Juror was asked at the hearing: "Now, you didn't tell us that you knew the Frisbie family until we went back into the judge's chambers in private; correct?" Juror responded:

> I did not tell you, but I didn't know how to tell you any other way. I was asked in jury selection up here, I said—you know, we were asked if we knew these people. I didn't know the people that I was asked. I honestly thought that, okay, they're asking for the prosecution, and here's going to come defense and you were gonna ask.
> And I was—I'm like, okay, how do I do this now? I mean, because I was going to say something then, but I thought we had to wait to be asked specific questions.

Following the hearing, the court entered its ruling denying Webster's motions. The court found that, based on the record made, a new trial was not warranted and judgment should not be arrested on the basis of juror misconduct. The court acknowledged Juror's Facebook activity while she was a sitting juror was "unnecessary, inappropriate, and inconsistent with the court's admonitions,"

but it concluded it was "not misconduct that exceeds the tolerable bounds of jury deliberation." Additionally, it found there was no evidence Juror's conduct was "calculated to, and with reasonable probability did, influence the verdict. To the contrary, [Juror] expressed post-trial an inclination toward a [first]-degree-murder verdict but agreed with eleven other jurors for a lesser [second]-degree-murder verdict." The court also found,

> if there was any undisclosed bias by [Juror] in favor of the victim's family, and against the defendant, it was not reflected in the verdict in which she participated. Nor [was] there any indication any such ostensible bias influence or infected any discussions or deliberations of the jury as a whole.

Webster now appeals.

## II. *Discussion.*

On appeal, Webster contends the district court abused its discretion in denying his post-trial motions because Juror's conduct rose to the level of misconduct that prevented him from having a fair trial. He also challenges certain evidentiary rulings by the trial court. To the extent we find his claims not preserved, Webster argues his trial counsel was ineffective.

Under both the United States Constitution and the Iowa Constitution, criminal defendants are guaranteed due process rights to a fair trial and an impartial jury. U.S. Const. amend. VI, XIV; Iowa Const. art. I, §§ 9, 10; *see also State v. Mootz*, 808 N.W.2d 207, 221 (Iowa 2012). That guarantee entails freedom from both juror misconduct and juror bias. *See State v. Johnson*, 445 N.W.2d 337, 340-41 (Iowa 1989) (discussing claims of juror bias and juror misconduct); *State v. Cuevas*, 288 N.W.2d 525, 534-35 (Iowa 1980) (same). Even if no actual prejudice is shown, "a court must always be concerned that all

trials maintain an appearance of propriety. Conduct which would give rise to doubt or disrespect or which would not meet public approval should be condemned." *State v. Lampman*, 342 N.W.2d 77, 80 (Iowa Ct. App. 1983) (citing *Daniels v. Bloomquist*, 138 N.W.2d 868, 872 (Iowa 1965)). Nevertheless, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Similarly, juror impartiality does not demand complete juror ignorance of issues and events. *See State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985).

### A. Juror Misconduct.

Juror misconduct is defined as a

> juror's violation of the court's charge or the law, committed either during trial or in deliberations after trial, such as (1) communicating about the case with outsiders, witnesses, attorneys, bailiffs, or judges, (2) bringing into the jury room information relating to the case but not in evidence, and (3) conducting experiments regarding theories of the case outside the court's presence.

Black's Law Dictionary 1089 (9th ed. 2009). Thus, the "term 'jury misconduct' often is used to describe both action by jurors that is contrary to their responsibilities and conduct by others which contaminates the jury process with extraneous influence." 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.9(f) (3d ed. Dec. 2013). When allegations of juror misconduct are raised after a verdict has been issued, our rules of criminal procedure authorize the grant of a new trial if "the jury has received any evidence, paper or document out of court not authorized by the court." Iowa R. Crim. P. 2.24(2)(b)(2). More specifically:

> Based on objective facts elicited from the jurors concerning the alleged misconduct, the court may grant a new trial if (1) the acts or

statements complained of exceed tolerable bounds of jury deliberation, and (2) the misconduct was calculated to, and with reasonable probability did, influence the verdict.

*State v. Proctor*, 585 N.W.2d 841, 845 (Iowa 1998); *see also Johnson*, 445 N.W.2d at 340 (stating there are three elements: "(1) [E]vidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct; (2) the acts or statements complained of must exceed tolerable bounds of jury deliberation; and (3) it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict."); *see also State v. Henning*, 545 N.W.2d 322, 324 (Iowa 1996) (finding Henning was entitled to a new trial where extraneous prejudicial information was improperly brought to the jury's attention and it was very likely that information would prejudice the views of a typical juror). In ruling on an allegation of juror misconduct, the district court enjoys broad discretion. *Proctor*, 585 N.W.2d at 845. Consequently, we review the court's ruling for an abuse of discretion, which will only be found it the discretion was exercised "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.*

Only evidence relating to conduct which occurred prior to the jury's reaching a verdict is relevant to Webster's argument of juror misconduct. *Cuevas*, 288 N.W.2d at 535. Here, that evidence would include the convenience store incident that occurred during the course of the trial, Juror's "liking" the

victim's step-mother's Facebook post, "Give me strength," and Juror's less than candid responses made during the in-chambers questioning.

Juror engaged in conversation about the trial with other customers and the store clerk at a convenience store. Under the circumstances as explained by the Juror, we do not find the incident to be sufficient evidence of misconduct warranting the grant of a new trial.

We agree with the trial court that Juror's "liking" the "Give me strength" Facebook post was "unnecessary and inappropriate, and inconsistent with the Court's admonitions." Although Juror should have refrained from responding to the post, we do not find the incident, standing alone, to be sufficient evidence of misconduct warranting the grant of a new trial.

Most troubling, and a much closer question, is Juror's failure to fully disclose to the court, the parties, and their attorneys, the extent of her relationship with the victim's family when questioned in chambers. But, we do not find the incident, standing alone, to be sufficient evidence of misconduct warranting the grant of a new trial.

Juror's misconduct during the trial cannot be condoned in any way shape or form. Nevertheless, and even if we consider her acts of misconduct collectively, we cannot say the trial court abused its discretion in denying Webster's motions for new trial and in arrest of judgment on the juror misconduct issue, for there is no evidence the misconduct was calculated to, and with reasonable probability did, influence the verdict. So, we turn to the juror bias issue.

### B. Juror Bias.

Separate from the issue of juror misconduct is juror bias. While couched in terms of "juror misconduct," Webster's motions for new trial and in arrest of judgment certainly cover the juror-bias issue. The testimony taken at the hearing and the argument made thereafter also address the issue of juror bias.[4]

A biased juror that sits on a jury, though takes no explicit action, can, by itself, render the jury's verdict unfair. *See State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993); *State v. Bruce*, 48 Iowa 530, 535 (1878) (stating that by excluding "all partial, biased, and prejudiced jurors," "a true verdict on the evidence submitted on the trial" will be rendered). "Jury bias, either actual or apparent, undermines society's confidence in its judicial system." 50A C.J.S. *Juries* § 369. A defendant is "entitled to be tried by [twelve], not [nine] or even [ten] impartial and unprejudiced jurors." *Parker v. Gladden*, 385 U.S. 363, 366 (1966).

However, the mere fact a juror knows a witness or other related party is not a basis for a challenge for cause, without more. *See* Iowa R. Crim. P. 2.18(5) (detailing grounds of challenges for cause); *State v. Sommer*, 86 N.W.2d 115, 124-25 (Iowa 1957); *see also Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) ("[T]he fact that a juror was acquainted with the victim or her family . . . would not suggest that the juror would harbor any particular bias regarding insanity as a criminal defense."); *Ex parte Killingsworth*, 82 So. 3d 761,

---

[4] Webster's counsel argued at the hearing: "Under these circumstances, Your Honor, no legal judgment can be pronounced on the verdict had in this case where there consists these concerns and these questions regarding a juror's conduct *and her loyalties*, both prior, during, and after the trial." (Emphasis added.)

764 (Ala. 2010) ("The fact that a prospective juror knows the victim or members of the victim's family does not automatically disqualify the prospective juror for cause."); *State v. Burgess*, 703 S.E.2d 512, 514 (S.C. Ct. App. 2010) ("[T]he fact that a juror has some relationship with the victim does not automatically require the trial judge to remove the juror.").

Generally speaking, a guilty verdict will not be overturned in the absence of some factual showing, and not mere speculation, that a seated juror was not impartial. *See Neuendorf*, 509 N.W.2d at 746. "For the purpose of determining juror prejudice, the relevant question is not what a juror has been exposed to, but whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant." *Gavin*, 360 N.W.2d at 819 (citing *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)); *State v. Rhodes*, 288 N.W. 98, 103 (Iowa 1939) ("A person is qualified to act as a juror when it is apparent from his entire examination that, notwithstanding his present knowledge of the facts or any opinion which he may have formed therefrom, he can try the case fairly and impartially on the evidence alone."); *see also Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004). "Any claim that the jury that did serve in the case was not impartial must be based on matters that appear of record." *Neuendorf*, 509 N.W.2d at 747. A claim of juror bias may be "logically supported by statements of the allegedly biased juror made either before or after the rendition of the verdict." *Cuevas*, 288 N.W.2d at 534.

Here, Juror believed, and told others in the courthouse, she would not be selected for the jury panel because of her relationship with the victim's family. Juror's daughter was a very good friend of the victim's sibling, and Juror's

daughter discussed the case with Juror, to the extent, if not more, that Juror had formed an opinion of the victim's family ("they're good people"), and the victim (he "was just this kind, sweet, gentle, polite person"), and the defendant (he "was a mouthy, aggressive . . . verbally—you know, aggressive person"). Juror was also "friends" with the victim's mother on Facebook, and the two communicated on the social network before, during, and after the case. Even after being admonished not to discuss the case with others, and in spite of having been called into a conference to discuss her "friendship" with the victim's mother, Juror "Like[d]" the victim's mother's comment during the course of the trial. Immediately after trial, Juror communicated to the victim's mother on the social-networking site she "wish[ed the victim's mother] could have gotten murder in 1st degree."

Perhaps any one of these factors, alone, would not rise to the level of evidencing a bias on Juror's part. But taken together, it is impossible to find anything but an implied bias, if not actual bias, of Juror. Juror clearly disobeyed the court's repeated admonitions, and we can have but little faith in her self-serving declarations she would decide the case based on the evidence alone. Yet, even if Juror was wholly sincere in her statement that she could be impartial, it is difficult to accept for it runs counter to human nature, given her relationship with and feelings about the victim's family. *See State v. Jackson*, 203 A.2d 1, 7-8 (N.J. 1964) (finding juror's friendship with witness compromised the confidence in the basic fairness of the trial and entitled Jackson to a new trial); *see also United States v. Tucker*, 243 F.3d 499, 509 (8th Cir. 2001) (observing "that the idea of presumed bias is reserved for extreme cases, such as when a juror is a close

relative of a party or victim in the case"); *Little v. Commonwealth*, 422 S.W.3d 238, 242 (Ky. 2013) ("There are occasions when, despite the juror's answers, a juror's 'familial, financial or situational' relationship with the parties will be sufficient to sustain a motion to strike for cause, where such relationships are likely to 'subconsciously affect [the juror's] decision in the case.'"); *State v. Galindo*, 774 N.W.2d 190, 222-23 (Neb. 2009) (considering if "the conditions behind a juror's familiarity with a party, victim, attorney, or witness are such that those connections would probably subconsciously affect his or her decision of the case adversely to the defendants"); *Commonwealth. v. Lesko*, 15 A.3d 345, 413 (Pa. 2011) ("A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice."); *State v. Bruno*, 60 A.3d 610, 622 n.3 (Vt. 2012) ("The law infers bias when, irrespective of the answers given on voir dire, the prospective juror has such a close relationship with a participant in the trial, be it a witness, a victim, counsel, or a party, that the potential juror is presumed unable to be impartial.").

Due to her relationship with the victim's family, evidenced by her own statements of her relationship with the family, her communication with the victim's mother before, during, and after trial, particularly in light of her daughter's close relationship with the victim's family and Juror's "wish" the victim's mother had gotten a first-degree murder conviction, we must conclude Juror could not be impartial.

Furthermore, Juror's own self-assessment of her bias is illuminating. She herself believed she would not be selected as a juror because of her relationship

with the Frisbie family. And her excuse ("I didn't know how to tell you") for not saying something about her relationship with the Frisbie family during voir dire rings hollow. It is without apparent dispute that another venireman got up during voir dire and said, "I know the Webster family and I know the Frisbie family, and therefore I shouldn't be on the jury." Moreover, she was less than forthcoming when questioned in chamber about her relationship with the Frisbie family. All this points to Juror's partiality.

This is not just a case of whether or not Webster shot Frisbie; Webster admitted he shot Frisbie. The issue is ultimately whether Webster was justified in his actions, and thus, Webster's credibility and his rendition of the facts of Frisbie's history and his behavior the night in question are directly at issue here. Webster was entitled to have twelve impartial jurors consider his defense, not merely eleven, and there is no way we can determine what the outcome would have been without Juror on the panel who held an opinion about the Frisbie family and "wish[ed]" the victim's mother had gotten a first-degree murder verdict.

Although the following are cases were decided in the context of ineffective assistance of counsel claims, they are instructive in this case. In *Virgil v. Dretke*, the court was confronted with a situation where, due to counsel's deficient performance, two people who admitted bias were allowed to sit on the jury. 446 F.3d 598, 612 (5th Cir. 2006). The court concluded, given the fundamental nature of seating an impartial jury, the result of Virgil's trial was unreliable. *Id.* The court stated:

> "The jury box is a holy place." Our criminal justice system is predicated on the notion that those accused of criminal offenses are innocent until proven guilty and are entitled to a jury of persons

willing and able to consider fairly the evidence presented in order to reach a determination of guilt or innocence.

*Id.* at 613 (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)).

The Fifth Circuit lacked confidence in the adversarial process that resulted in Virgil's conviction: "Expressed in *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] terms, the deficient performance of counsel denied Virgil an impartial jury, leaving him with one that could not constitutionally convict, perforce establishing *Strickland* prejudice with its focus upon reliability." *Id.* at 613-14.

The Eighth Circuit also held that a defendant whose attorney fails to attempt to remove biased persons from a jury panel is prejudiced. *See Johnson v. Armontrout*, 961 F.2d 748, 755-56 (8th Cir. 1992), *called into doubt by United States v. Johnson*, 688 F.3d 494 (8th Cir. 2012). In *Johnson*, the court rejected the government's argument that the seating of biased jurors did not affect the outcome of the trial, and therefore, there was no showing of prejudice under *Strickland*, explaining: "This is an assumption we cannot make. Trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism itself." *Id.* at 755; *see also Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (holding when a biased juror is impaneled, prejudice under *Strickland* is presumed, and a new trial is required); *accord Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004).

Integrity is the cornerstone of our judicial process and that integrity "depends on the guarantee that every litigant receive a fair trial." *Tobias v. Smith*, 468 F. Supp 1287, 1289 (W.D.N.Y. 1979); *see also, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 413 (1991) ("The purpose of the jury system is to impress upon the

criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair."); *Walker v. Lockhart*, 726 F.2d 1238, 1249 (8th Cir. 1984) (Arnold, J., concurring) ("If due process means anything, it means a trial before an unbiased judge and jury."). Any compromise to this integrity, or even appearance of compromise, is not acceptable. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 342 (1989) (Brennan, J., dissenting) (noting the destruction of "the appearance of justice casts doubt on the integrity of the judicial process"); *In re Murchison*, 349 U.S. 133, 136 (1955) ("Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness."); *Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice."). When a biased juror is impaneled, the fundamental fairness of the proceedings is called into question. This indelible taint can only be abated by a new trial. *See Hughes*, 258 F.3d at 463. "The right to a jury trial is a bulwark of liberty enshrined in the Constitution. Because 'justice must satisfy the appearance of justice,' courts need to ensure that tainted jury verdicts—even those reached after long and costly trials—do not stand." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 448 (S.D.N.Y. 2012). Consequently, we must find the court abused its discretion in denying Webster's motion for new trial. Webster is entitled to a new trial with an impartial jury.

Because we conclude Webster is entitled to a new trial, we need not address his other issues. For the foregoing reasons, we reverse the district

court's ruling and remand the case for a new trial.

**REVERSED AND REMANDED FOR A NEW TRIAL.**

Vaitheswaran, J., concurs; McDonald, J., concurs in part and dissents in part.

**MCDONALD, J.** (concurring in part and dissenting in part)

I concur in the majority's holding that the district court did not abuse its discretion in denying Webster's motion for new trial based on his claim of juror misconduct. I respectfully dissent from the majority's finding of juror bias and the majority's decision to reverse and remand this matter for new trial. Webster's claim of juror bias is not properly presented for appellate review. To the extent the claim of juror bias is properly presented for appellate review, the claim fails on the merits. First, Webster waived the claim. Second, controlling federal and state authority provides the post-trial hearing on Webster's motion for new trial that afforded him the opportunity to prove juror bias is all the relief to which Webster is constitutionally entitled. Third, and related, there is no basis for concluding the district court clearly abused its discretion in denying Webster's motion for new trial. I would thus affirm the judgment of the district court.

The issue of juror bias was not presented to or decided by the district court, and the claim is thus not preserved for our review. *See Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 322 (Iowa 2013) ("We do not reach this argument, however, because it was not adequately raised and was not decided in the district court."); *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002) ("The rule of error preservation applies with equal strength to constitutional issues."). As the majority makes clear, juror misconduct and juror bias are separate and distinct claims. Here, Webster's motion for new trial presented only a claim of juror misconduct. Paragraph five of the motion states the juror's actions "amount to juror misconduct which denied the Defendant a fair trial." Paragraph six of the motion states the juror's failure to fully disclose her relationship with the victim's

family "would be juror misconduct." In the same paragraph, Webster argued the juror's use of information about the family learned outside trial was "juror misconduct." The district court's ruling characterized Webster's argument as follows: "Alleged juror misconduct which denied Defendant a fair trial." The district court then made findings of fact and conclusions of law related only to a claim of juror misconduct. The district court held "the Court cannot conclude a new trial is warranted, or that judgment should be arrested, on the basis of jury misconduct." The district court further held "[t]here is insufficient evidence of misconduct to set aside the verdict or grant a new trial." While there is discussion in the ruling regarding juror bias, the discussion is limited to bias as evidence of misconduct and not a stand-alone claim of juror bias. Nowhere does the district court address a separate claim of juror bias. Webster did not request the district court amend or enlarge its ruling to address a stand-alone claim of juror bias. Accordingly, error is not preserved.

Even assuming the issue of juror bias was preserved for appellate review, the claim fails on the merits. First, Webster waived his claim of juror bias by failing to challenge the juror prior to the jury being sworn:

> It is well settled that known objections, or those which may be ascertained, are waived if no challenge is made before the jury is sworn. . . . The bias objection may have also been based upon [the juror's] alleged prior knowledge of defendant. That was unquestionably an appropriate subject of inquiry during voir dire, and thus could have been ascertained in time for an expedient motion. Thus, that basis for the objection may also be considered waived.

*State v. Cuevas*, 288 N.W.2d 525, 534 (Iowa 1980) (citations and internal quotation marks omitted); *see United States v. Johnson*, 688 F.3d 494, 501 (8th

Cir. 2012) (holding the "failure to object at the time the jury is empaneled operates as a conclusive waiver if the basis of the objection is known or might have been known or discovered through the exercise of reasonable diligence"); *State v. Johnson*, 445 N.W.2d 337, 340 (Iowa 1989) (holding bias claim was waived by failing to challenge juror prior to jury being impaneled); *Smith v. State*, 656 P.2d 277, 282 ("This Court has repeatedly held that it is the appellant's duty on voir dire examination to inquire into all matters which are within his knowledge and which might affect a juror's qualifications, and if he fails to do so, he waives any objection on that point even though disqualification is unknown to him until after the verdict is rendered."). In this case, the challenged juror did not make misrepresentations to or otherwise mislead the attorneys or the court regarding her relationship with the victim's family during voir dire. Instead, the attorneys failed to ask questions that would have elicited a response revealing the relationship. *Cuevas* and *Johnson* are controlling, and they hold the failure to challenge this juror constitutes waiver.

Second, Webster also waived his right to make a claim of juror bias by failing to challenge this juror during trial. During the course of trial, information came to the court's attention regarding this juror's relationship with the victim's family. The district court allowed voir dire. Although Webster contends the juror did not provide complete information regarding the nature of her relationship with the victim's family during voir dire, the record belies the claim. The juror stated she had known the victim's family since the time her daughter was in high school. She stated she saw some information regarding the shooting on Facebook prior to trial and may have had conversations with her daughter regarding the shooting

prior to trial. Despite knowing the juror had some relationship with the victim's family, Webster did not challenge the juror for cause or suggest the juror be replaced by one of the available alternate jurors. The rationale of *Cuevas* and *Johnson* compel the conclusion that Webster's failure to challenge this juror for cause during trial or request an alternate replace her constitutes waiver of his claim.

Third, to the extent the claim was not waived, Webster received all the relief to which he is entitled. The only federal constitutional relief to which Webster is entitled is a post-trial hearing affording him the opportunity to prove actual bias or imputed/implied bias. *See Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); *Id.* at 222 (O'Connor, J., concurring) ("In certain circumstances, I would also hold that there are some extreme situations that would justify a finding of implied bias."). Likewise, the only state constitutional relief to which Webster is entitled is the same post-trial hearing described in *Smith*:

> In the instant case, defendant was given an opportunity to prove actual bias on the part of a juror in a hearing before the court, which is the appropriate remedy for allegations of juror partiality. *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 946, 71 L.Ed.2d 78, 85 (1982). . . . A court cannot presume a jury disregarded its duties without evidence in support of such a conclusion. *State v. White*, 223 N.W.2d 173, 177 (Iowa 1974). . . .
>
> Although no actual prejudice was shown, a court must always be concerned that all trials maintain an appearance of propriety. Conduct which would give rise to doubt or disrespect or which would not meet public approval should be condemned. *Daniels v. Bloomquist*, 258 Iowa 301, 307, 138 N.W.2d 868, 872 (1965). However, due process does not require a new trial every time a juror has been placed in a potentially compromising situation.

*State v. Lampman*, 342 N.W.2d 77, 80 (Iowa Ct. App. 1983). In this case, the district court held a post-trial hearing in which Webster was afforded the opportunity to prove actual bias or imputed/implied bias. To the extent the claim of juror bias was presented in the post-trial motion, the district court held that Webster had not proved bias. *Smith* and *Lampman* hold this is all the relief to which Webster is entitled.[5]

Fourth, the standard of review is largely dispositive of Webster's claim. The post-trial hearing arose in the context of Webster's motion for new trial. It was Webster's burden to prove that a new trial was warranted. *See State v. Nebinger*, 412 N.W.2d 180, 189 (Iowa Ct. App. 1987). The majority concludes the district court abused its discretion in denying Webster's motion and that Webster is entitled to a new trial. I agree in part, and I disagree in part. I agree with the majority that the district court is vested with broad discretion in ruling on a motion for new trial asserting juror misconduct or other jury irregularity. *See State v. Proctor*, 585 N.W.2d 841, 845 (Iowa 1998); *State v. Jones*, 511 N.W.2d 400, 409 (Iowa Ct. App. 1993); *State v. Nebinger*, 412 N.W.2d 180, 189 (Iowa Ct. App. 1987). I disagree with the majority that the district court abused its discretion in denying Webster's motion for new trial.

"Abuse of discretion means the trial court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable."

---

[5] The majority cites several cases for the proposition that the seating of a partial juror is a fundamental defect in the trial mechanism constituting *Strickland* prejudice. I do not disagree with that proposition. Those cases, however, rest upon a finding that the challenged juror was, in fact, biased. Here, as discussed below, the district court found this juror was not biased. Thus, the cases upon which the majority relies are inapposite.

*See State v. Milom*, 744 N.W.2d 117, 122 (Iowa Ct. App. 2007); *Nebinger*, 412 N.W.2d at 189. Other than disagreement with the district court's finding that Webster had not proved bias, the majority does not identify in what manner the district court's ruling was untenable or unreasonable. Further, in the context of a ruling on a motion for new trial, not only is the district court's decision reviewed for an abuse of discretion, "[w]e do not interfere with that discretion unless there is a clear showing of abuse." *State v. Smith*, 240 N.W.2d 693, 696 (Iowa 1976); *see State v. Harrington*, 349 N.W.2d 758, 761 (Iowa 1984) ("We do not find an abuse of discretion . . . unless the action of the trial court is clearly unreasonable under the attendant circumstances."), *abrogated on other grounds by Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). This additional deference is granted to the district court's ruling because "[m]otions for new trial are not favored and should be closely scrutinized and sparingly granted." *State v. Weaver*, 554 N.W.2d 240, 244 (Iowa 1996). On this record, I cannot conclude the district court abused its discretion, let alone clearly abused its discretion, in denying Webster's motion for new trial.

The nature of the relationship between the juror and the victim's family, in and of itself, is not grounds for finding bias. The relationship is not of the type from which bias is necessarily inferred and that would support a challenge for cause. *See* Iowa R. Crim. P. 2.18(5). In fact, the relationship was attenuated— the juror's daughter was high school friends with the victim's half-sister or step-sister. The victim's mother was included in the juror's Facebook social network, but that fact alone does not indicate a meaningful relationship. *See Sluss v. Commonwealth*, 381 S.W. 215, 222 (Ky. 2012) (noting on Facebook "a person

can become 'friends' with people to whom the person has no actual connection"); *see also id.* n.8 (noting the performer Lady Gaga had millions of Facebook "friends"). Also, the inference of bias that could be drawn from the relationship between the juror and the victim's family, if any, is mitigated by the fact the juror also had a relationship to the defendant's family—the juror's parents were good friends of the defendant's wife's family. The juror was also Facebook friends with one of Webster's wife's relatives.

In addition, jurors "need not be completely ignorant of the issues and events involved in a trial." *State v. Hoeck*, 547 N.W.2d 852, 861 (Iowa Ct. App. 1996) (citation omitted). "It is sufficient if the juror can lay aside his impressions or opinion and render a verdict based on the evidence presented in court." *State v. Walters*, 426 N.W.2d 136, 139 (Iowa 1988) (citation omitted). Here, the challenged juror testified that she could be impartial and render a decision based on the evidence:

> Q. Is there anything about these relationships and your knowledge of these people that, you know, that would cause you decide this case on anything other than what you hear in the courtroom? A. No.
> Q. Is there anything about any of those relationships that would cause you to be biased in favor of one party or the other? A. No.
> Q. Have you made up your mind yet? A. No.

The juror's testimony that she was not biased and could render a verdict based solely on the evidence is sufficient, in and of itself, to conclude the district court did not clearly abuse its discretion in denying Webster's motion for new trial on the ground of juror bias.

The majority seems to take issue with this juror's "self-serving declarations" that she was not biased and that she could decide the case based solely on the evidence. The majority concludes that it is only human nature that she would be biased. Perhaps. In *Smith*, the court recognized that claims of juror misconduct or juror bias "will frequently turn upon the testimony of the juror in question." *Smith*, 455 U.S. at 217 n.7. The Supreme Court specifically instructed that it is error to assume the juror's testimony is inherently suspect:

> One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.

*Id.* This juror testified she was not biased. The judge ruling on the motion for new trial was the same judge who presided over the case, who observed the juror during voir dire and during the post-trial hearing, and who was in the best position to make a credibility determination. I would defer to the district court's finding in this case.

Finally, a review of our cases shows that an attenuated relationship—whether malevolent or benevolent—between a juror and a party or witness in the case is generally not a ground for retrial where the juror has expressed a willingness and ability to remain impartial. For example, in *State v. Hendrickson*, 444 N.W.2d 468, 471-72 (Iowa 1989), a very similar case arising in the context of a motion for mistrial, our court affirmed the district court's decision to deny the motion where it was alleged the juror had animosity toward the defendant's companion but testified he could remain impartial. It is worth quoting from that case at length:

The record shows that jury selection in the present case began with the court administering the oath to the entire panel of prospective jurors. During the selection process, counsel for the State read a list of names of potential witnesses and requested that the potential jurors, including Powell, signal if a name was familiar to them or if they knew the person in any way. Among the names read aloud by counsel was the name Dean Summers. Powell did not respond.

Powell did respond, however, to other questions, including inquiries concerning his past jury experience. After a brief voir dire concerning Powell's jury experience, counsel for the State and Powell concluded as follows:

Q: Mr. Powell, do you know of any reason why you cannot be fair and impartial? A: No. I got work like all the rest of them.

Q: Okay. But other than that, do you believe you can be fair and impartial? A: Yes.

Q: You don't know of any reason why you could not? A: No.

Known objections to prospective jurors, or objections which may be ascertained, are waived if no challenge is made before the jury is sworn. Defendant asserts, however, that he has not waived his objection to Powell. Rather, defendant contends that Powell's response (or lack of response) when asked during voir dire whether he knew Dean Summers was less than candid, and this response prevented defendant from discovering Powell's potential bias.

We believe defendant's allegations of concealment and underlying allegations of juror bias and misconduct are without merit. In denying defendant's motion for a mistrial, the district court noted Powell's responses, made while under oath, that he could be fair and impartial. The trial court also noted that the alleged relationship between defendant and Powell was highly attenuated.

The subject matter of the information withheld by the juror did not relate to matters constituting a challenge for cause. The information's only use to defendant would be to in some way undermine the juror's assurances that he knew of no reason why he could not be impartial.

It clearly would have reflected more favorably on the juror had he been more candid in responding to the general question, and the information might have been of value to defendant in evaluating his choices for strikes. It does not, however, follow that defendant was deprived of a fair trial. The general rule is that an illegal verdict does not result from false information given by a juror if the information is so insignificant as to indicate only a remote or speculative influence. 47 Am.Jur.2d Jury § 209, at 797 (1969).

There is no evidence that juror Powell could not hear and decide defendant Hendrickson's case impartially. Reviewing these

circumstances, we agree with the district court that defendant's allegations of bias were speculative and did not warrant a mistrial. Although the trial court could have excused juror Powell and used an available alternate juror, the court did not abuse its discretion in denying defendant's motions.

*Hendrickson*, 444 N.W.2d at 472 (citations omitted).

Likewise, in *State v. Kneeskern*, 210 N.W.2d 465 (1926), a juror was challenged based on preexisting knowledge of the case. During voir dire the juror testified that he had no opinion of the case and knew nothing that would influence his verdict except what he would hear at trial. *Id.* at 473. On motion for new trial, numerous affidavits were filed averring that the challenged juror said on the opening day of trial that he knew all about the case and knew that defendant was guilty. *Id* at 473-74. The juror denied the allegations, and the district court denied the motion for new trial. The supreme court affirmed the denial of motion for new trial, concluding the disputed issue "was primarily for the district court." *Id.* at 474. Similarly, in *State v. Becker*, 140 N.W. 201 (1913), on motion for new trial there was evidence that a juror made statements evidencing bias notwithstanding his statement to the contrary during voir dire. The juror denied the allegations, and the supreme court affirmed the denial of the motion for new trial concluding the "issue was primarily for the district court, and with its conclusion we are not inclined to interfere." *Id.* at 203.

I largely agree with the rationale of *Hendricksen*, *Kneeskern*, and *Becker*. The district court is in the best position to make a credibility determination regarding juror bias. Here, the district court did not find actual bias or implied bias. The majority disagrees with that finding, essentially conducting de novo review. Our case law makes clear that the district court's finding is entitled to

greater weight. *See State v. Ebelsheiser*, 43 N.W.2d 706, 713 (1950) (stating the question of whether misconduct occurred or bias was present is a "disputed question of fact and the trial court's decision, upon conflicting evidence, is controlling"). Accordingly, I would affirm the judgment of the district court.